

1   Laura A. Schroeder, NSB #3595
    Therese A. Ure Stix, NSB #10255
2   Caitlin R. Skulan, NSB #15327
    *Schroeder Law Offices, P.C.*
3   10615 Double R Boulevard, Suite 100
    Reno, Nevada 89521
4   Telephone Number:   775-786-8800
    Telecopy Number:    877-600-4971
    Emails:             counsel@water-law.com
5                       Laura A. Schroeder - schroeder@water-law.com
                        Therese A. Ure Stix - therese@water-law.com
6                       Caitlin R. Skulan - c.skulan@water-law.com
    *Attorneys for Plaintiff, Colvin & Son, LLC*

7                  **UNITED STATES DISTRICT COURT**

8                       **DISTRICT OF NEVADA**

9   COLVIN & SON, LLC,

10                              Plaintiff,          **Case No.**

11          v.                                      **COMPLAINT FOR JUDICIAL
                                                    REVIEW OF AGENCY DECISION
12  DEB HAALAND IN HER OFFICIAL                     RELATING TO WILD HORSES**
    CAPACITY AS SECRETARY OF THE
13  UNITED STATES DEPARTMENT OF THE
    INTERIOR; TRACY STONE-MANNING IN
14  HER OFFICIAL CAPACITY AS DIRECTOR
    OF THE BUREAU OF LAND
15  MANAGEMENT; JON RABY IN HIS
    OFFICIAL CAPACITY AS THE NEVADA
16  STATE DIRECTOR OF THE BUREAU OF
    LAND MANAGEMENT; DOUG FURTADO
17  IN HIS OFFICIAL CAPACITY AS DISTRICT
    MANAGER FOR THE BATTLE MOUNTAIN
18  DISTRICT, NEVADA, BUREAU OF LAND
    MANAGEMENT; and PERRY B. WICKHAM
19  IN HIS OFFICIAL CAPACITY AS THE FIELD
    MANAGER FOR THE TONOPAH FIELD
20  OFFICE, BATTLE MOUNTAIN DISTRICT,
    NEVADA, BUREAU OF LAND
21  MANAGEMENT,

22                              Defendants.

23

24          Plaintiff, *Colvin & Son, LLC*, does hereby allege:

25          1.    **Preliminary Statement.** Within Defendants exercise of discretion under the *Wild*

26  *and Free Roaming Horses & Burro Act*, 16 U.S.C. § 1331, et seq., Defendants made two (2)

determinations. First, Defendants determined an overpopulation of wild horses existed within the Little Fish Lake Joint Management Area ("Little Fish Lake JMA" or "JMA"), inclusive of the Little Fish Lake Wild Horse Herd Management Area ("HMA") upon the public lands, and the Little Fish Lake Wild Horse Territory ("WHT") upon the national forest system lands ("NFSL"); all within the State of Nevada. Second, given the first determination, Defendants determined that action was necessary to remove the excess wild horses within the Little Fish Lake JMA.

2.      Based upon its determinations, Defendants considered and assessed Alternatives in the Little Fish Lake Joint Management Area Wild Horse Gather Plan, Final Environmental Assessment, DOI-BLM-NV-B020-2022-0030-EA, dated August 2, 2022, AR-Document #3[1] ("2022 FEA"),[2] as to the action necessary to remove the excess wild horses within the Little Fish Lake JMA. Specifically, Alternative A – Proposed Action in the 2022 FEA involved three (3) distinct actions over the 10-year life of the plan; namely: (1) Initially, gather and remove excess wild horses to achieve low Appropriate Management Level ("AML") either in a single first gather or over multiple phased gathers, depending on BLM national priorities, resources, and off-range corral space availability. (2) Administer and/or booster population control measures to gathered and released wild horses, as well as sex ratio adjustment, to slow population growth and maintain the wild horse population within AML. (3) Conduct additional/maintenance gathers after the initial gather(s) to bring wild horse population back to low AML if the population grows to again exceed AML during the 10-year plan life after low AML was achieved.

3.      Based upon its 2022 FEA, Defendants issued its Decision Record dated August 2, 2022 ("2022 DR"), AR-Document #1, that: (1) selected Alternative A - Proposed Action in the

---

[1] The "AR-Document #__" references herein are to the Defendants' Administrative Record filed before the U.S. Department of the Interior, Office of Hearings and Appeals, Board of Land Appeals ("IBLA").

[2] *See also* Finding of No Significant Impact for Little Fish Lake Joint Management Area Gather dated August 2, 2022, AR-Document #2 ("2022 FONSI"); and Supplemental Information for the Little Fish Lake Joint Management Area Wild Horse Gather Plan, Environmental Assessment, DOI-BLM-NV-B020-2022-0030-EA, dated August 2, 2022, AR-Document #4 ("2022 FSI-FEA").

1   2022 FEA, AR-Document #1 at 2; and (2) did not explicitly include any conditions to delay

2   implementation of its Decision Record, *see generally* AR-Document #1.

3       4.    Notwithstanding the Defendants' Determinations, 2022 FEA, 2022 FONSI, and

4   2022 DR, Defendants did not and have not, even as of the filing of this Complaint, actually

5   implemented the 2022 DR, which the lack of implementation is a violation of the *Wild and Free*

6   *Roaming Horses & Burro Act*, 16 U.S.C. § 1331, et seq., causing harm to Colvin, to the public

7   lands and national forest systems lands within the Little Fish Lake JMA, and to the wild horses

8   themselves.

9       5.    Given the foregoing paragraphs, including all of the other allegations in this

10   Complaint, Colvin files this Complaint for judicial review of the 2022 DR to hold unlawful any

11   conditions (except for <u>on-site</u> conditions) which allow Defendants to defer (and continue defer)

12   implementation of the 2022 DR, and to compel immediate implementation of the 2022 DR, as

13   required by the *Wild and Free Roaming Horses & Burro Act*, 16 U.S.C. § 1331, et seq.

14       6.    **Jurisdiction.** Jurisdiction is proper in this Court under 28 U.S.C. § 1331 (Federal

15   question) because this civil action arises under the Constitution, laws, or treaties of the United

16   States, including the *Wild and Free Roaming Horses & Burro Act*, 16 U.S.C. § 1331, et seq. An

17   actual, justiciable controversy exists between the parties, and requested relief, inclusive of

18   preliminary and permanent injunctive relief, is therefore proper under 5 U.S.C. §§ 702, 704, 705,

19   706(2) (*Administrative Procedure Act*). The federal government has waived sovereign immunity

20   in this action pursuant to 5 U.S.C. § 702.

21       7.    **Venue.** The basis of venue is: (a) 28 U.S.C. § 1391(b)(2) (A civil action, where a

22   "substantial part" of the claim arose); (b) 28 U.S.C. § 1391(e)(1)(A) (A civil action involving an

23   officer or employee of the United States, where "a defendant in the action resides"); and (c)

24   Nevada Federal District Court LR IA 1-6 and LR IA 1-8.

25       8.    **Plaintiff.** Plaintiff, *Colvin & Son, LLC* ("Colvin"), is a Nevada limited liability

26   company, with entity number LLC7980-2000, and a formation date of August 18, 2000.

9.      While Colvin was formed over twenty-two (22) years ago on August 18, 2000, its original member, Tom Colvin, Jr., owned private land and water rights and held a Bureau of Land Management ("BLM") Grazing Permit within the Stone Cabin and Wagon Johnnie Allotments, and also held a U.S. Forest Service ("USFS") Grazing Permit within the Little Fish Lake and Wagon Johnnie Allotments since 1964. Tom Colvin, Jr., and now *Colvin & Son, LLC*, have operated a yearlong, cow-calf livestock operation within the area in question for a long time. This operation is inclusive of private land, water rights, livestock, a BLM Grazing Permit, a USFS Grazing Permit, machinery, equipment, and incidental assets to sustain such livestock operation. This livestock operation has been dependent upon public land use and national forest system land use for a long time and has consistently cooperated with the federal land management agencies to achieve applicable rangeland health standards, *see* AR-Document Nos. 32, 38, land use plan objectives, *see* AR-Document Nos. 34, 28, and forest plan objectives, *see* AR-Document Nos. 36, 28.[3]

10.     Colvin owns private land within the administrative boundary of the BLM Stone Cabin Allotment which private land has historically served as the "Base property" for BLM and USFS Grazing Permits and which has also historically served as the base of operations for its livestock operation.

11.     Colvin also owns *other* private land within the administrative boundary of the BLM Stone Cabin Allotment, BLM Wagon Johnnie Allotment, USFS Little Fish Lake Allotment, USFS Wagon Johnnie Allotment, and USFS McKinney Allotment, including some associated water rights upon the private land, public lands, and national forest system lands.

12.     Colvin also holds a BLM Grazing Permit that authorizes it to graze livestock upon the public lands within the Stone Cabin Allotment and Wagon Johnnie Allotment. The Stone

---

[3] The applicable BLM allotments and Horse Management Areas ("HMAs") are governed by the 1997 Tonopah Resource Management Plan and Record of Decision, as amended. AR-Document Nos. 34, 28. The applicable USFS allotments and Wild Horse Herd Territories are governed by the 1986 Humboldt/Toiyabe Forest Plan, as amended. AR-Document Nos. 36, 28. Both of these Plans were amended in 2015 to include specific management provisions for wild horses and for livestock for the conservation of the Greater sage-grouse. AR-Document #28.

Cabin Allotment is adjacent to the McKinney Allotment. Colvin depends upon use of the public lands within such allotments to sustain its year-long livestock operation. This dependency is adversely impacted by the Defendants' unlawful management of wild horses within the BLM Wagon Johnnie Allotment since the Little Fish Lake JMA covers such Allotment, as well as the USFS Wagon Johnnie Allotment. AR-Document #3 at 47 (Table 3).

13.    Colvin also holds a USFS Grazing Permit that authorizes it to graze livestock upon the national forest system lands within Little Fish Lake Allotment and Wagon Johnnie Allotment. Colvin depends upon use of the national forest system lands within such allotments to sustain its year-long livestock operation. This dependency is adversely impacted by the Defendants' unlawful management of wild horses within the USFS Wagon Johnnie Allotment since the Little Fish Lake JMA covers such Allotment, as well as the BLM Wagon Johnnie Allotment. AR-Document #3 at 47 (Table 3).

14.    **Defendants.** Defendant, DEB HAALAND IN HER OFFICIAL CAPACITY AS SECRETARY OF THE UNITED STATES DEPARTMENT OF THE INTERIOR ("Haaland"), is believed to maintain an office at 1849 C Street, N.W., Washington DC 20240, and manages the public lands and the wild horses upon the public lands in, among others, the State of Nevada, including the associated funding appropriated to the USFS and transferred to the "Department of the Interior, Bureau of Land Management, for removal, preparation, and adoption of excess wild horses from National Forest System lands" as per Public Law 117-103, 136 Stat. 396 (3-15-2022) (which covered the fiscal year ending September 30, 2022)[4] and as per Public Law 117-328, __ Stat. __, H.R. 2617-348 (12-29-2022) (which covers the fiscal year ending September 30, 2023).[5]

---

[4] Beyond the funds appropriated to the USFS and transferred to the USDI-BLM, the *Consolidated Appropriations Act, 2022*, Public Law 117-103 (March 15, 2022), also appropriated to the U.S. Department of the Interior the sum of approximately $137 million for the "wild horse and burro program." Public Law 117-103, 136 Stat. 348. This authorization also included authority to the Department of Interior to "enter into multiyear cooperative agreements with nonprofit organizations and other appropriate entities … for the long-term care and maintenance of excess wild free roaming horses." Public Law 117-103, 136 Stat. 375.

[5] Beyond the funds appropriated to the USFS and transferred to the USDI-BLM, the *Consolidated Appropriations Act, 2023*, Public Law 117-328 (December 29, 2022), appropriated

15.     Defendant, TRACY STONE-MANNING IN HER OFFICIAL CAPACITY AS DIRECTOR OF THE BUREAU OF LAND MANAGEMENT ("Stone-Manning"), is believed to maintain an office at 1849 C Street N.W., Washington DC 20240, and manages the public lands and the wild horses upon the public lands in, among others, the State of Nevada, including the associated funding appropriated to the USFS and transferred to USDI-BLM as related to removal of excess wild horses as noted in paragraph 14 herein.

16.     Defendant, JON RABY IN HIS OFFICIAL CAPACITY AS THE NEVADA STATE DIRECTOR OF THE BUREAU OF LAND MANAGEMENT ("Raby"), is believed to maintain an office at 1340 Financial Blvd., Reno, Nevada 89502, and manages the public lands and the wild horses upon the public lands in the State of Nevada, including the associated funding appropriated to the USFS and transferred to USDI-BLM as related to removal of excess wild horses as noted in paragraph 14 herein.

17.     Defendant, DOUG FURTADO IN HIS OFFICIAL CAPACITY AS DISTRICT MANAGER FOR THE BATTLE MOUNTAIN DISTRICT, NEVADA, BUREAU OF LAND MANAGEMENT ("Furtado"), is believed to maintain an office at 50 Bastian Road, Battle Mountain, Nevada 89820, and manages the public lands and wild horses upon the public lands in the Battle Mountain District, State of Nevada, including the associated funding appropriated to the USFS and transferred to USDI-BLM as related to removal of excess wild horses as noted in paragraph 14 herein.

18.     Defendant, PERRY B. WICKHAM IN HIS OFFICIAL CAPACITY AS THE FIELD MANAGER FOR THE TONOPAH FIELD OFFICE, BATTLE MOUNTAIN DISTRICT, NEVADA, BUREAU OF LAND MANAGEMENT ("Wickham"), is believed to maintain an office at 1553 South Main Street, Tonopah, Nevada 89049, and manages the public

---

to the U.S. Department of the Interior the sum of approximately $148 million for the "wild horse and burro program." Public Law 117-328, __ Stat. __, H.R. 2617-302. This authorization also included authority to the Department of Interior to "enter into multiyear cooperative agreements with nonprofit organizations and other appropriate entities … for the long-term care and maintenance of excess wild free roaming horses." Public Law 117-328, __ Stat. __. H.R. 2617-328.

lands and the wild horses upon the public lands in the Tonopah Field Office, Battle Mountain District, State of Nevada, including the associated funding appropriated to the USFS and transferred to USDI-BLM as related to removal of excess wild horses as noted in paragraph 14 herein.

19.    **Statement of Facts.** JMA. The Little Fish Lake Joint Management Area ("Little Fish Lake JMA" or "JMA") is located approximately 70 miles northeast of Tonopah, Nye County, Nevada. AR-Document #3 at 2. It includes a total of 117,041 acres, of which the HMA is inclusive of 28,744 of the 117,041 acres of private and public lands, and of which the WHT is inclusive of 88,247 of the 117,041 acres of private and national forest system lands. AR-Document #3 at 6 (Table 1). The private land is owned by Colvin except for 40-acres.

20.    The Little Fish Lake JMA is a subpart of the Tonopah Field Office, Battle Mountain District, Nevada, BLM ("BLM"), and is also a subpart of the Austin-Tonopah District Ranger Office, Toiyable-Humboldt National Forest, Nevada, U.S. Forest Service ("USFS"), as illustrated in the Maps in the 2022 FSI-FEA, AR-Document #4 at 72, and in the 2022 FEA, AR-Document #3 at 5.

21.    The Little Fish Lake JMA implicates the Little Fish Lake Wild Horse Herd Management Area ("HMA"), and the Little Fish Lake Wild Horse Territory ("WHT"). AR-Document #1 at 1.

22.    The Little Fish Lake JMA also implicates the whole of the BLM Wagon Johnnie Allotment and the whole of the USFS Wagon Johnnie Allotment. AR-Document #3 at 47 (Table 3).

23.    Colvin's Preliminary Comments. On April 27, 2022, Colvin commented to the Field Manager of the Tonopah Field Office, regarding its monitoring of the public lands and NFSLs in the Stone Cabin, Willow Creek, Hunts Canyon, Wagon Johnnie, Little Fishlake, and Monitor Complex Allotments in coordination and cooperation with Defendants and USFS, noting that such monitoring has disclosed "wild horse numbers grossly in excess of AML levels,

1   as prescribed by the 1997 Tonopah RMP-ROD," and that this "excess has adversely implicated

2   utilization levels and in some places the underlying rangeland condition."

3       24.   As to grossly excess wild horse numbers, Defendants' wild horse population data

4   as of March 1, 2022, ratified the foregoing statement by Colvin in paragraph 23, noting that

5   Little Fish Lake HMA had an appropriate management level ("AML") of 24-39 head of wild

6   horses, yet the "2022 estimated horse pop" was 323 head, or 754% above the AML. AR-

7   Document #22; *see also* AR-Document #24 (BLM's wild horse census data in 2021).

8       25.   As to the adverse utilization levels, the utilization data in November 2021, ratified

9   the foregoing statement by Colvin in paragraph 23. AR-Document #23; *see also* AR-Document

10  #3 at 29 (Map of JMA 2021 Utilization).

11      26.   Colvin's preliminary comments added that based upon such monitoring:

12      Colvin … demand[s] that the BLM and USFS forthwith return such allotments to
        the prescribed AML levels. …

13
        Covin (sic.) … contend[s] that, due to the year-round use by excess wild horses,
14      the gather should not be anything less than full reduction to low AML (or lower),
        and due to on-the-ground conditions, BLM and USFS should consider removing
15      wild horses to the low AML (or lower) on a continuing annual basis for a number
        of years. Colvin … recognize[s] that an opportunity to "comment" to the pending
16      Little Fishlake Gather will be provided, but they hope to instill a sense of urgency
        (as well as annual wild horse observation (counts) and reductions-as-necessary
17      which may be called for). …

18      27.   2022 DEA and 2022 DSI-2022 DEA. On May 11, 2022, Defendants issued for

19  public comment, AR-Document #1 at 3, its 2022 DEA, AR-Document #5, and its 2022 DSI-

20  DEA, AR-Document #20. These documents speak for themselves, though for purposes of this

21  Complaint, the "Purpose and Need" of the 2022 DEA was stated by Defendants to be as follows:

22      The purpose of the Proposed Action is to gather and remove excess wild horses
        from within and outside the Little Fish Lake JMA. The current wild horse
23      population in the JMA exceeds the Appropriate Management Level by over 250
        animals and is growing by 15-25% annually. The excess horses in the JMA are
24      impacting vegetation condition, wildlife habitat, and water quality. There is a need
        to reduce wild horse populations growth rates in the JMA and maintain the
25      population at or below the established AML.

26  / / /

1  The need for the action is to prevent undue or unnecessary degradation of the public
2  lands and national forest system lands associated with excess wild horses, and to
   restore a TNEB and multiple-use relationship on public lands, consistent with the
3  provisions of Section 1333(b) of the WFRHBA. The action would also limit the
   impacts to private property located in the JMA.

4  AR-Document #5 at 5.

5      28.    The 2022 DEA considered and assessed three (3) alternatives, i.e., Alternative A -

6  Proposed Action, AR-Document #5 at 11-15; Alternative B - Gather & Removal without

7  Fertility Control Treatments, *Id*. at 15; and Alternative C - No Action, *Id*. at 20. The 2022 DEA

8  also considered and assessed several "Management Actions Common to Alternatives A, and B."

9  *Id*. at 15-20.

10     29.    Alternative A - Proposed Action stated in part in the 2022 DEA the following:

11  Proposed Action (Alternative A) would involve three distinct types of activities
12  over the 10-year life of the plan:

13  1. Initially, gather and remove excess wild horses to achieve low AML either in a
    single first gather or over multiple phased gathers, **depending on BLM national
14  priorities, resources, and off-range corral space availability**.

15  2. Administer and/or booster population control measures to gathered and
    released horses, as well as sex ratio adjustment, to slow population growth and
16  maintain the wild horse population within AML.

17  3. Conduct additional/maintenance gathers after the initial gather(s) to bring wild
    horse population back to low AML if the population grows to again exceed AML
18  during the 10-year plan life after low AML was achieved.

19  At the current population, if a single gather were to be immediately implemented
    to reach low AML, the BLM would gather and remove approximately 251 excess
20  wild horses within the JMA. However, the wild horse population grows each year
    and if an initial gather is delayed, or if multiple gathers are necessary to achieve
21  low AML, the number of excess wild horses needing gather and removal to achieve
    low AML would be higher. All three components of the Proposed Action would
22  allow BLM to achieve management goals and objectives of attaining a herd size
    that will not exceed AMLTNEB on the range as identified within the WFRHBA.

23  …

24  Population inventories and routine resource/habitat monitoring would continue to
    be completed every two to three years to document current population levels,
25  growth rates, and areas of continued resource concerns (horse concentrations,
    riparian impacts, over-utilization, etc.). **Funding limitations and competing
26  national priorities may impact the timing and ability to gather and conduct
    population control components of the Proposed Action.**

**Page  9 - COMPLAINT**

1
2
3

The management objective for the Little Fish Lake JMA is to achieve and maintain AML over the 10-year plan period. BLM would achieve this through gather and removal of excess animals along with use of population growth suppression measures …

4   AR-Document #5 at 11-12 (emphasis added).

5        30.    As quoted in paragraph 29, and as relevant to this Complaint, Alternative A -

6   Proposed Action in the 2022 DEA included two (2) *similarly* worded conditions, as follows:

7       (1) "The Proposed Action (Alternative A) would involve three distinct types of
8           activities over the 10-year life of the plan: 1. Initially, gather and remove
excess wild horses to achieve low AML either in a single first gather or over
9           multiple phased gathers, **depending on BLM national priorities, resources,
and off-range corral space availability**." AR-Document #5 at 11 (emphasis
10           added).

11       (2) "**Funding limitations and competing national priorities may impact the
timing and ability to gather and conduct population control components
12           of the Proposed Action**." AR-Document #5 at 12 (emphasis added).

13   The 2022 DEA and even the 2022 DSI-DEA provided no rationale for such *similarly* worded

14   conditions. *See generally* AR-Document #5, AR-Document #20.

15        31.    <u>Public Comments, including those by Colvin</u>. On or before the close of the

16   comment period on June 10, 2022, Defendants received comments to the 2022 DEA and 2022

17   DSI-DEA. AR-Document #1 at 4; *see also* AR-Document Nos. 6-19, 21.

18        32.    One of the comments submitted was from Colvin. AR-Document #6. Colvin's

19   comments speak for themselves, but Colvin commented and objected to the two (2) *similarly*

20   worded conditions in the 2022 DEA, as quoted above in paragraph 30. *See* AR-Document #6 at 6

21   (wherein Colvin commented/objected to the "depending on BLM national priorities, resources,

22   and off-range corral space availability" condition); *Id*. at 6 (wherein Colvin commented/objected

23   to the "[f]unding limitations and competing national priorities" condition). Colvin commented

24   that "[n]either the law, nor the BLM [Tonopah] RMP provide for this conditional statement,"

25   adding that "[t]he law, and the RMP, **require that BLM keep the wild horses at, or below**

26   **AML**," and further adding, that "[l]ikewise, the Forest Plan does not contain such conditioning

1   of the obligation to remove excess wild horses." *Id*. at 5; *see also* AR-Document #3 at 18. As

2   discussed below in paragraph 35, Defendants acknowledged receipt of such comment/objection

3   in Appendix I. of the 2022 FEA at AR-Document #3 at 18-19.

4      33. <u>2022 DR and 2022 FONSI</u>. Several months later, on August 2, 2022, Defendants

5   issued its 2022 DR, AR-Document #1, its 2022 FEA, AR-Document #3, its 2022 FSI-FEA, AR-

6   Document #4, and its 2022 FONSI, AR-Document #2. These documents speak for themselves,

7   though for purposes of this Complaint, as to the 2022 DR, the 2022 DR: (1) selected and

8   implemented Alternative A - Proposed Action in the 2022 FEA, AR-Document #1 at 2; and (2)

9   did not explicitly include any of the conditions quoted in paragraph 30, *see generally* AR-

10   Document #1, *see also* AR-Document #2 (wherein the 2022 FONSI also did not explicitly

11   include any of the conditions quoted in paragraph 30).

12      34. <u>2022 FEA</u>. As to the 2022 FEA, the 2022 FEA had the *same* "Purpose and Need"

13   as in the 2022 DEA, as quoted above in paragraph 27, except the number "250 animals" in the

14   DEA was changed to "200 animals" in the FEA. *Compare* AR-Document #3 at 7 and AR-

15   Document #5 at 8.

16      35. In addition, as to the 2022 FEA, the 2022 FEA considered and assessed three (3)

17   alternatives similar to those considered and assessed in the 2022 DEA, though with some

18   changes based *in part* upon the comments submitted by Colvin. Specifically, Defendants adopted

19   the comment submitted by Colvin to remove the conditions discussed above in paragraphs 30

20   and 32, stating that "[t]he EA has been updated to clarify the number to be gathered and removed

21   in table 1, and **the conditional statement 'depending on BLM national priorities, resources,**

22   **and off-range corral space availability' has been removed**." AR-Document #3 at 19

23   (emphasis added). In other words, Defendants agreed that "BLM national priorities,"

24   "resources," and "off-range corral space availability" would not excuse the timing and ability to

25   gather the excess wild horses.

26   */ / /*

**Page  11 - COMPLAINT**

36.     Notwithstanding, while Defendants did remove from the 2022 FEA the phrase "depending on BLM national priorities, resources, and off-range corral space availability," Defendants either mistakenly omitted removing it from the 2022 FEA or intentionally removed it only to put it back in the 2022 FEA using the same and added language. This is revealed by the Defendants: (1) maintaining the "[f]unding limitations and competing national priorities" condition in the 2022 FEA at AR-Document #3 at 12; and (b) adding new language in the 2022 FEA, stating:

> While the agency's plan is to promptly remove all excess animals above low AML, it is unlikely that a single gather can achieve this because of gather efficiency limitations (animals evading capture during the gather operations), logistical limitations (e.g. weather conditions, terrain and large geographic area to be gathered), population inventory undercounts, **space capacity limitations (for holding removed animals),** and limited contractor availability and expertise that limit the number of gathers that can be conducted annually at the national level.

AR-Document #3 at 11 (emphasis added). In other words, Defendants maintained and added to the conditions that it agreed to remove from the 2022 FEA; namely conditions associated with "[f]unding limitations," "competing national priorities," "space capacity limitations." Defendants provided no rationale in the 2022 DR for agreeing to remove such conditions yet maintain and add to them in the 2022 FEA.

37.     BLM Land Use Plan and USFS Forest Plan: Like the 2022 DEA, the 2022 FEA included a "Land Use Plan Conformance and Consistency with Other Authorities" statement. AR-Document #3 at 7-10. However, such statement included no legal justification for the conditions quoted in paragraph 36.

38.     Final Agency Action: The 2022 DR stated that the "decision is effective immediately pursuant to 43 CFR 4770.3(c)." AR-Document #1 at 2.

39.     The 2022 DR also stated that it was administratively appealable to the U.S. Department of the Interior, Office of Hearings and Appeals, Board of Land Appeals ("IBLA"), and that it was also subject to being stayed (aka enjoined) pending any administrative appeal to the IBLA. AR-Document #1 at 4.

40.     On September 1, 2022, Colvin filed its Notice of Appeal of the 2022 DR, 2022 FONSI, and 2022 FEA to the IBLA. The appeal did not wholly challenge the 2022 DR, 2022 FONSI, or 2022 FEA. Instead, the appeal challenged the deferral of the *actual* implementation of 2022 DR, inclusive of the three (3) conditions allowing such deferral of the *actual* implementation stated in paragraph 36; namely: (1) the "[f]unding limitations" condition stated within Alternative 1-Proposed Action in the 2022 FEA, AR-Document #3 at 12; (2) the "competing national priorities" condition stated within Alternative 1-Proposed Action in the 2022 FEA, AR-Document #3 at 12; and (3) the "space capacity limitations" stated within Alternative 1-Proposed Action in the 2022 FEA, AR-Document #3 at 11. These three (3) conditions are hereinafter referred to as the "*Off-site Conditions*."

41.     On November 1, 2022, Defendants filed with the IBLA and Colvin the Administrative Record.

42.     On January 13, 2023, Colvin filed its Statement of Reasons in support of its administrative appeal with the IBLA, and Colvin also filed its Petition for Partial Stay to stay (aka enjoin) the effectiveness of the Defendants' reliance upon the three (3) conditions stated in paragraphs 36 and 40 which deferred (and continue to defer) the *actual* implementation of the 2022 DR.

43.     On March 3, 2023, the IBLA denied the Petition for Stay. Such denial continued to make the 2022 DR operable and effective, inclusive of the three (3) conditions stated in paragraphs 36 and 40, which allowed the Defendants to continue to indefinitely defer the *actual* implementation of the 2022 DR.

44.     Thereafter, contemporaneous with filing this Complaint, Colvin dismissed its administrative appeal before the IBLA because the agency action was final.

45.     The 2022 DR, 2022 FONSI, and 2022 FEA are final agency action per 5 U.S.C. § 704, given the 2022 DR stated on its face that it was "effective immediately pursuant to 43 CFR § 4770.3(c)", AR-Document #1 at 2, and given Colvin's attempt, through agency rule, to make

1  the 2022 DR, 2022 FONSI, and 2022 FEA inoperative pending its administrative appeal was

2  denied by the IBLA via an Order dated March 3, 2023. *See* 43 C.F.R. § 4.21(c) (10-1-2021

3  Edition) (wherein "No decision which at the time of its rendition is subject to appeal to … an

4  Appeals Board shall be considered final so as to be agency action subject to judicial review

5  under 5 U.S.C. 704, unless a petition for a stay of decision has been timely filed and the decision

6  being appealed has been made effective in the manner provided in paragraphs (a)(3) or (b)(4) of

7  this section or a decision has been made effective pending appeal pursuant to paragraph (a)(1) of

8  this section or pursuant to other pertinent regulation.").

9  **CLAIM FOR RELIEF**

10  **VIOLATION OF THE *WILD AND FREE-ROAMING HORSES AND BURRO ACT***

11  46.    Colvin re-alleges and incorporates by reference the allegations contained in

12  paragraphs 1 through 45.

13  47.    The U.S. Congress enacted the *Wild and Free-Roaming Horses and Burro Act*, 16

14  U.S.C. §§ 1331-1340 ("WFRHBA"), to protect wild free-roaming horses and burros as an

15  integral part of the natural areas where they were found. 16 U.S.C. § 1331; *see generally In*

16  *Defense of Animals v. U.S. Dep't of the Interior*, 751 F.3d 1054, 1061-62 (9th Cir. 2014).

17  48.    In 1978, Congress amended the WFRHBA to "facilitate the humane adoption or

18  disposal of excess wild free-roaming horses and burros which, because they exceed the carrying

19  capacity of the range, pose a threat to their own habitat, fish, wildlife, recreation, water and soil

20  conservation, domestic livestock grazing, other rangeland values." 43 U.S.C. § 1901(a)(6).

21  Under the 1978 amendments, Defendants are responsible for managing wild horses "at the

22  minimal feasible level," and "in manner that is designed to achieve and maintain a natural

23  balance" between wild horse and burro populations, wildlife, livestock, and vegetation, and to

24  protect the range from "the deterioration associated with overpopulation" of wild horses and

25  burros on the public lands. 16 U.S.C. §§ 1333(a), 1333(b)(2); *see also* 43 C.F.R. § 4710.4 (10-1-

26  2021 Edition); *Dahl v. Clark,* 600 F.Supp. 585, 593-94 (D. Nev. 1984); *Michael Blake,* 138

1    IBLA 170, 177 (1997).

2        49.    "Excess animals" is a term defined by statute as wild free-roaming horses or

3    burros which either have been removed or must be removed from an area "in order to preserve

4    and maintain a thriving natural ecological balance and multiple-use relationship in that area." 16

5    U.S.C. § 1332(f).

6        50.    To comply with the foregoing statutory obligations, the statute's removal

7    provision envisioned a two-step decision-making process: First, Defendants are to determine

8    whether any overpopulation exists, and second, Defendants are to determine whether action is

9    necessary to remove excess animals. *DeLong Ranches, Inc.*, IBLA 2012-235 (IBLA Order dated

10   Sept. 16, 2014) at 13; *see also American Wild Horse Campaign*, 198 IBLA 1, 2 (2022); *State of*

11   *Wyoming v. United States Department of Interior*, 839 F.3d. 938, 944-945 (10th Cir. 2016). This

12   two-step process "may determine that action is *not* necessary to remove these horses exceeding

13   the AML and, alternatively, it may determine that such action is necessary and prescribe a

14   management plan implementing a combination of actions and methods." *DeLong Ranches, Inc.*

15   at 13-14 (emphasis added).

16       51.    Here, in the exercise of their discretion, Defendants conformed to the two-step

17   decision-making process. As to step one, Defendants determined overpopulation of wild horses

18   exists within the Little Fish Lake JMA. This is/was demonstrated by the "Rationale" in the 2022

19   DR, AR-Document #1, at 1-2, and by language in the 2022 FEA, AR-Document #3, at 6-7,

20   stating that "Based upon all current information available at this time, the BLM has determined

21   that excess wild horses exist within the Little Fish Lake JMA. These excess wild horses need to

22   be removed in order to achieve the established AML, restore a thriving natural ecological

23   balance (TNEB) and prevent further degradation of rangeland resources." AR-Document #3 at 6.

24       52.    As to step two, Defendants determined that action is necessary to remove excess

25   wild horses within the Little Fish Lake JMA. This is/was demonstrated by the "Decision" in the

26   2022 DR, prescribing a management plan "to implement the Proposed Action (Alternative A)" as

1   described in the 2022 FEA, adding that such "proposed action is consistent with the land use

2   plans and would allow for achievement of management objectives in the Little Fish Lake JMA,"

3   and further adding that BLM Tonopah Field Office "would gather and remove excess wild

4   horses within and outside of the Little Fish Lake JMA to achieve AML (approximately 251 as of

5   July 2022 (sic.)) through an initial gather or gathers and administrated or booster population

6   control measures to gather or released horses through subsequent maintenance gathers over a

7   period of ten years … [which] would allow BLM to achieve management goals and objectives of

8   attaining a herd size that is at the low range of AML, reducing wild horse population growth

9   rates, and achieving a thriving natural ecological balance on the range as required under the

10  WFRHBA." AR-Document #1 at 1.

11      53.     Notwithstanding satisfying the requisite steps to remove the excess wild horses

12  from the Little Fish Lake JMA, and notwithstanding the immediate effectiveness of the 2022 DR

13  as of August 2, 2022, Defendants deferred (and have continued to defer) the *actual*

14  implementation of the 2022 DR, even as of the filing of this Complaint, i.e., over 10-months and

15  counting.

16      54.     Defendants flip-flop on both sides of the fence to excuse their deferral. On one

17  side of the fence, Defendants criticized Colvin for its administrative appeal of the *Off-site*

18  *Conditions*, claiming that the *Off-site Conditions* are <u>not</u> the reason for the deferral at all, stating:

19          [Colvin] mischaracterizes BLM's Final EA and Decision Record by implying that
            BLM has approved a decision that is not intended to promptly remove excess
20          animals to reach low AML by stating that BLM has identified "national priorities"
            and "funding limitations" as a basis for not removing all excess animals in an
21          initial gather.[] These implicit and/or explicit representations of BLM's decision
            are inaccurate.
22

23  BLM's Answer dated February 13, 2023, at 7, before the IBLA. On the other side of the fence,

24  Defendants claimed <u>other</u> off-site conditions exist to support the reason for the deferral, stating:

25          Notwithstanding Appellant's view that space capacity limitations should never be
            a factor in the removal of excess animals, BLM clearly cannot remove animals
26          from the range under the WFRHBA **if it would be impossible to ensure their
            safety and humane care post-removal**, given that Congress has prohibited the
            destruction of healthy excess animals removed from the range.

**Page  16 - COMPLAINT**

1   BLM's Answer dated February 13, 2023, at 7, before the IBLA (emphasis added) (hereinafter

2   referred to as the "*Other Off-site Conditions*"). However, as discussed below, whether the

3   reasons for the deferral are the *Off-site Conditions* or are the *Other Off-site Conditions*, both are

4   not legally authorized to indefinitely defer the removal of the excess wild horses from the Little

5   Fish Lake JMA under the WFRHBA. None of these conditions are permitted under the

6   WFRHBA or under the WFRHBA regulations. "[D]iscretion evaporates once BLM determines

7   'that action is necessary to remove excess animals,' 16 U.S.C. § 1333(b)(2)." *Western Rangeland*

8   *Conservation Association v. Zinke*, 265 F.Supp.3d 1267, 1282 (D. Utah 2017).

9       55.    The WFRHBA, 16 U.S.C. §§ 1331-1340, and the WFRHBA regulations, 43

10  C.F.R. Part 4700 (10-1-2021 Edition), do not disclose that the *Off-site Conditions* or *Other Off-*

11  *site Conditions* can defer the actual implementation of the Act or the regulations.

12      56.    The WFRHBA is explicit in Section 1333(b)(2) as to the directions to the

13  Secretary to "**immediately remove** excess animals from the range so as to achieve appropriate

14  management levels" (emphasis added). None of these directions include authority to condition

15  the immediate removal of excess animals. *See also* 43 C.F.R. § 4720.1 (10-1-2021 Edition).

16      57.    Here, Defendants exercised their discretionary authority in its 2022 DR. This

17  authority prescribed an action "to achieve management goals and objectives of attaining a herd

18  size that is at the low range of AML, reducing wild horse population growth rates, and achieving

19  a thriving natural ecological balance on the range as required under the WFRHBA," AR-

20  Document #1 at 1, yet Defendants then unlawfully conditioned such action via the *Off-site*

21  *Conditions* or via the *Other off-site Conditions*; violating 16 U.S.C. §§ 1333(b)(1), 1333(b)(2),

22  and its implementing regulations, i.e. 43 C.F.R. § 4720.1 (10-1-2021 Edition). Defendants cited

23  no legal authority to support such conditions in the 2022 DR, 2022 FONSI, or 2022 FEA. In fact,

24  a case out of the U.S. District Court, District of Utah, entitled *Western Rangeland Conservation*

25  *Association v. Zinke*, 265 F.Supp.3d 1267 (D. Utah 2017), supports that such <u>off-site</u> conditions

26  cannot be reasons for the agencies' failure to act.

58. *Western Rangeland Conservation Association* involved a situation wherein a party challenged the Secretary of the Interior's failure to immediately gather and remove excess wild horses upon the public lands. While the case ultimately turned on the "unreasonable delay" standard under the *Administrative Procedure Act*, 5 U.S.C. § 706(1), as opposed to an "arbitrary and capricious" standard under the *Administrative Procedure Act*, 5 U.S.C. § 706(2) (as is the situation in this Complaint), the case grappled with the authority of Secretary of the Interior ("Secretary") to condition the immediate gather and removal of excess wild horses under the WFRHBA. The court in *Western Rangeland Conservation Association* resolved the struggle by distinguishing the Secretary's authority based upon <u>on-site</u> gather conditions (to which the court found the Secretary does have "some discretionary space" under the WFRHBA) and the Secretary's authority based upon <u>off-site</u> gather conditions (to which the court found the Secretary has very little discretionary space under the WFRHBA). In this regard, the court stated:

> Based on these practical realities, the court cannot interpret Section Three to require removal of excess wild animals without any intervening delay -- such an interpretation would contravene the ultimate purposes of the WHA by forcing BLM to act recklessly and without regard for the continuing viability or humane treatment of creatures it is specifically tasked with preserving. … Section Three's mandate to "immediately remove" must therefore include some discretionary space in which BLM may plan and execute safe, efficient, and effective removals consistent with the broader purposes of the WHA and in compliance with other statutory duties.
>
> **At the same time, the court cannot accept BLM's contention that the "pace and timing" of removals are entirely discretionary. … The term "immediately" must mean something -- its presence in the statute necessarily places some temporal limits on any discretion BLM has to plan and execute removal actions.** The D.C. Circuit has explained that the term "immediately" indicates that Congress desired that "excess horses ... be removed expeditiously" and decided that "prompt action was needed to redress ... imbalance" in wild horse populations on public lands. … Indeed, the statute indicates that "immediate [ ]" removal action is required "so as to restore a thriving natural ecological balance to the range[ ] and [to] protect the range from the deterioration associated with overpopulation." … **Any unnecessary delay or lack of urgency in reducing the population to within AML would contravene these purposes by allowing excess wild horses to persist, propagate, and consume an imbalance of already scarce resources. With the viability of the range and the wild horses themselves in immediate peril as a result of overpopulation, BLM cannot postpone action to remove excess wild horses once it determines that such action is necessary.** To the extent that practical realities preclude truly

"immediate" removal, BLM may only delay necessary removal actions insofar as delay is necessary to plan and execute the actions safely and effectively. Proper planning and execution would of course account for many of the practical realities that BLM has identified, including due analysis of circumstances on the ground, compliance with NEPA and FLPMA, and retention of experienced contractors.

**In sum, once BLM determines that an overpopulation exists in a given area and action is necessary to remove that overpopulation, Section Three demands that BLM address the overpopulation through removal and that the agency begin and complete removal as soon as logistically possible**.

*Western Rangeland Conservation Association*, 265 F.Supp.3d at 1284-1285 (emphasis added, internal citations omitted, and internal footnotes omitted).

59.    There is a clear distinction between <u>on-site</u> gather conditions and <u>off-site</u> gather conditions. On the one hand, as to <u>on-site</u> gather conditions, Defendants maintain "some discretion space" under Section 3 of the WFRHBA to ensure that the actual gather and removal are planned and executed on-the-ground in a safe, efficient, and effective manner. *Western Rangeland Conservation Association*, 265 F.Supp.3d at 1284. On the other hand, as to <u>off-site</u> gather conditions, Defendants maintain little discretion given the temporal limits under Section 3 of the WFRHBA to actually remove the excess animals from the public lands itself. *See Western Rangeland Conservation Association*, 265 F.Supp.3d at 1285 (wherein the District Court stated that "[t]o the extent that practical realities preclude truly "immediate" removal, BLM may only delay necessary removal actions insofar as delay is necessary to plan and execute the actions safely and effectively," i.e., the <u>on-site</u> gather mechanisms).

60.    Here, the *Off-site Conditions* and the *Other Off-site Conditions* are within the <u>off-site</u> gather conditions category. In fact, assuming a sole reliance upon the *Other Off-site Conditions*, as Defendants claimed in its Answer dated February 13, 2023, to the IBLA, Defendants admit that such conditions are an <u>off-site</u> gather conditions when Defendants speak of a need "**to ensure their safety and humane care <u>post-removal</u>**." Bold and underline emphasis added.

/ / /

61.     Both the *Off-site Conditions* and *Other Off-site Conditions* were actually considered and rejected as being within the discretionary space of the Secretary in *Western Rangeland Conservation Association*, stating:

> … the defending parties suggest that BLM has wide discretion in how to implement Section Three's mandate and that the current … approach to wild horse management fulfills BLM's statutory obligation to "immediately remove" excess animals: "Because the [WHA] imposes no specific timetable for removing horses after [BLM] has made the required removal determinations, especially when taking into account all the complex and competing factors surrounding removal actions, there has been no 'delay' in this case …" … The court must reject BLM and Defendant-Intervenors' arguments on this point.

> BLM's … approach to removal fails to fulfill the agency's Section Three duty to "immediately remove" excess animals in at least two fundamental ways. First, the "phased-in" approach prioritizes gradual removal and other management techniques over prompt removal to within AML. As explained above, Section Three unequivocally requires BLM to address overpopulations through immediate removal of excess animals once the agency makes certain triggering determinations regarding an area of the public lands. Having made the requisite determinations in the areas at issue, BLM cannot choose to address the identified overpopulation through gradual removals and the application of immunocontraceptives and adjustment of sex ratios -- the agency *must* address the overpopulation through immediate removal.

> Second, the … approach contemplates gradual, rather than "immediate[ ]" removal of excess animals. Though Section Three imposes no specific timetable for necessary removals, the statute clearly demands prompt removal and forbids unnecessary delay. BLM urges that a six-to-ten-year delay is necessary "due to **limited resources** [and] competing removal needs across [ten] western states," …, but such broad administrative concerns cannot erase Section Three's demand for urgency. While it is clear that Section Three's mandate to "immediately remove" excess wild horses must account for the practical realities of the removal process, the fundamental nature of BLM's statutory duty cannot be altered by the **agency's budgetary constraints**. Here, the six-to-ten-year timetable of the "phased-in" approach is primarily attributable to these broader administrative constraints and not to the practical realities of removal. Indeed, BLM acknowledges that the "phased-in" approach to removal is required because "[n]ationwide, **short and long term holding space** for excess wild horses removed from the range is limited." … Further, the total numbers of animals removed over the life of the plan is at least partially contingent on "administrative factors (**budget**, adoptions, **holding space**, etc.)." … **Such "administrative factors" do not give BLM license to redefine their statutory obligation under Section Three. As explained above, BLM is required by law to remove excess animals to within AML as soon as the actions necessary to complete removal can be safely and effectively carried out**. Removal that occurs gradually over nearly a decade does not fulfill that requirement.

Page  20 - COMPLAINT

1   *Western Rangeland Conservation Association*, 265 F.Supp.3d at 1286-1287 (emphasis added,

2   internal citations omitted, and internal footnotes omitted).

3        62.    It is not disputed that Defendants itself determined that an overpopulation of wild

4   horses exists in the Little Fish Lake JMA and that action is necessary to remove that

5   overpopulation. *See* AR-Document #1 at 2. This determination demanded -- subject only to the

6   <u>on-site</u> gather conditions (which are not disputed by Colvin and which are included in the 2022

7   FSI-FEA, Section 4, AR-Document #4 at 13-18) -- that Defendants address the overpopulation

8   through the immediate removal of the excess wild horses in the JMA, and not conditioned upon

9   the *Off-site Conditions* or upon the *Other Off-site Conditions*.

10        63.    Even the *Western Rangeland* court explicitly noted that the "fundamental nature

11   of BLM's statutory duty cannot be altered by the agency's budgetary constraints," and that

12   "'administrative factors' do not give BLM license to redefine their statutory obligation under

13   Section Three." *Western Rangeland Conservation Association*, 265 F.Supp.3d at 1287.

14        64.    Colvin has no other legal remedy to remove excess wild horses from the Little

15   Fish Lake JMA than the statutorily prescribed reliance on agency action. *See* 16 U.S.C. § 1334

16   ("In no event shall such wild free-roaming horses and burros be destroyed except by the agents

17   of the Secretary").

18        65.    Accordingly, Defendants violated their statutory and regulatory obligations under

19   the WFRHBA and the regulations promulgated thereunder to defer (and continue to defer) the

20   *actual* implementation of the 2022 DR, inclusive of any reliance upon the *Off-site Conditions*

21   and upon the *Other Off-site Conditions*, subject only to <u>on-site</u> conditions as the court determines

22   are reasonable and consistent with the WFRHBA and the regulations promulgated thereunder.

23        66.    Wherefore, for the reasons and violations of the WFRHBA alleged in paragraphs

24   1-65, the 2022 DR constitutes final agency action judicially reviewable by this Court pursuant to

25   5 U.S.C. § 704, and such agency action must be held unlawful and be set aside to the extent it is

26   applied by the Defendants to defer (and continue to defer) the *actual* implementation of the 2022

1    DR, inclusive of the *Off-site Conditions* and *Other Off-site Conditions*, in accordance with

2    *Administrative Procedure Act*, 5 U.S.C. § 706(2)(A), (C). Preliminary and/or permanent

3    injunctive relief should be granted to compel the *actual* implementation of the 2022 DR subject

4    only to the <u>on-site</u> conditions as the court determines are reasonable and consistent with the

5    WFRHBA.

### PRAYER FOR RELIEF

7    Colvin requests that the Court grant the following relief:

8    A.   Order, declare, and adjudge that the *Off-site Conditions* and *Other Off-site Conditions*

9         in the 2022 DR, 2022 FONSI, and 2022 FEA allowing the deferral (and continued

10        deferral) of the *actual* implementation of the 2022 DR are unlawful under, and in

11        violation of WFRHBA and the regulations promulgated thereunder, other than the <u>on-</u>

12        <u>site</u> conditions as the court determines are reasonable and consistent with the

13        WFRHBA and the regulations promulgated thereunder;

14   B.   Issue an order setting aside and vacating the *Off-site Conditions* and *Other Off-site*

15        *Conditions* in the 2022 DR, 2022 FONSI, and 2022 FEA, other than the <u>on-site</u>

16        conditions as the court determines are reasonable and consistent with the WFRHBA

17        and the regulations promulgated thereunder;

18   C.   Granting preliminary injunctive relief and permanent injunctive relief to compel the

19        *actual* implementation and continued implementation of the 2022 DR subject only to

20        <u>on-site</u> conditions as the court determines are reasonable and consistent with the

21        WFRHBA and the regulations promulgated thereunder; and

22   / / /

23   / / /

24   / / /

25   / / /

26   / / /

**Page  22 - COMPLAINT**

1   D. For such other and further relief as the Court deems just, proper, and equitable,

2   including an award of Colvin's attorney fees and costs under any applicable law,

3   including the *Equal Access to Justice Act*, 28 U.S.C. § 2412.

4

5   DATED this 17th day of May, 2023.

6   ***SCHROEDER LAW OFFICE, P.C.***

7   By: /s/ *Therese A. Ure Stix*

8   Laura A. Schroeder, NSB #3595
    Therese A. Ure Stix, NSB #10255

9   Caitlin R. Skulan, NSB #15327
    *Schroeder Law Offices, P.C.*

10  10615 Double R Boulevard, Suite 100
    Reno, Nevada 89521

11  Telephone Number:   775-786-8800
    Telecopy Number:    877-600-4971

12  Emails:          counsel@water-law.com
                     Laura Schroeder - schroeder@water-law.com

13                   Therese A. Ure Stix - therese@water-law.com
                     Caitlin R. Skulan - c.skulan@water-law.com

14  *Attorneys for Plaintiff, Colvin & Son, LLC*

15

16

17

18

19

20

21

22

23

24

25

26

**Page  23 - COMPLAINT**