TODD KIM, Assistant Attorney General
U.S. Department of Justice
Environment & Natural Resources Division
S. JAY GOVINDAN, Section Chief
BRIDGET K. MCNEIL, Assistant Section Chief
JOSEPH W. CRUSHAM, Trial Attorney (CA Bar No. 324764)
Wildlife & Marine Resources Section
P.O. Box 7611, Ben Franklin Station
Washington, DC 20044-7611
Phone: (202) 307-1145
Email: joseph.crusham@usdoj.gov


*Attorneys for Federal Defendants*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| COLVIN & SON, LLC,<br><br>            Plaintiff,<br><br>      v.<br><br>DEBRA HAALAND *et al.*,<br><br>            Federal Defendants. | Case No. 3:23-cv-00204-ART-CLB<br><br>**FEDERAL DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT** |
| COLVIN & SON, LLC, *et al.*,<br><br>            Plaintiffs,<br><br>      v.<br><br>DEBRA HAALAND *et al.*,<br><br>            Federal Defendants. | |

# TABLE OF CONTENTS

**Pages**

INTRODUCTION ..................................................................................................2

BACKGROUND ...................................................................................................2

I.     LEGAL BACKGROUND .................................................................2

II.     FACTUAL AND PROCEDURAL BACKGROUND ........................................4

      A.     The Little Fish Decision and Gather Plan ...........................................4

      B.     The Stone Cabin Decision and Gather Plan .......................................7

      C.     Plaintiffs' Claims .........................................................................10

      D.     Procedural Background...................................................................12

STANDARD OF REVIEW ..................................................................................12

ARGUMENT ......................................................................................................13

I.   Plaintiffs' Claims Rest on Mischaracterizations of the Gather Plans and Facts Outside the Scope of the Court's Review..............................................................14

      A.   The Funding/Priorities Sentence Relates Only to the Population Control Components of Each Gather Plan, not the Initial Gathers to Reach AML. .........14

      B.   The Decisions and Gather Plans Do Not Condition Initial Gathers on Funding, Priorities, or Space Capacity, and Plaintiffs Improperly Rely on Facts Outside the Scope of the Court's Review to Argue Otherwise. ........................................16

II.   BLM's Gather Plans and Decisions are Reasonable and Comply with the Wild Horse Act. ......................................................................................................18

      A.   The Wild Horse Act Affords BLM Some Discretion as to the Timing of Gathers to Remove Excess Horses and Achieve AML.....................................18

      B.   BLM Acted Within its Discretion to Plan Safe, Effective, and Efficient Removals of Excess Animals that Comply with the Wild Horse Act. ...............19

CONCLUSION....................................................................................................25

# TABLE OF AUTHORITIES

**Cases**                                                                                           **Page(s)**

*Am. Horse Prot. Ass'n v. Watt*,
   694 F.2d 1310 (D.C. Cir. 1982) ............................................................................2

*Am. Wild Horse Pres. Campaign v. Jewell*,
   847 F.3d 1174 (10th Cir. 2016) ...................................................................3, 22

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*,
   462 U.S. 87 (1983) ...................................................................................13

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
   467 U.S. 837 (1984) .................................................................................13

*Citizens to Pres. Overton Park v. Volpe*,
   401 U.S. 402 (1971) .................................................................................12

*Friends of Animals v. BLM.*,
   548 F. Supp. 3d 39 (D.D.C. 2021) ...............................................................17

*Friends of Animals v. BLM*,
   No CV 18-2029 (RDM), 2024 WL 1344424 (D.D.C. Mar. 30, 2024) ...........................19, 25

*Friends of Animals v. Culver*,
   610 F. Supp. 3d 157 (D.D.C. 2022) ..........................................................19, 24

*Friends of Animals v. Silvey*,
   353 F. Supp. 3d 991 (D. Nev. 2018) ............................................................21

*Friends of the Clearwater v. Dombeck*,
   222 F.3d 552 (9th Cir. 2000) ..................................................................17, 18

*Fund for Animals v. BLM*,
   460 F.3d 13 (D.C. Cir. 2006) ......................................................................3

*In Def. Animals v. U.S. Dep't of Interior*,
   751 F.3d n.20 ...................................................................................3, 12

*In re United Mine Workers of Am. Int'l Union*,
   190 F.3d 545 (D.C. Cir. 1999) ....................................................................23

*Kleppe v. Sierra Club*,
   427 U.S. 390 (1976) .................................................................................12

*Lands Council v. McNair*,
   537 F.3d 981 (9th Cir. 2008) ......................................................................13

*Leigh v. Jewell*,
  No. 3:11-cv-00608-HDM-WGC, 2014 WL 31675 (D. Nev. Jan. 3, 2014)...........................3, 4

*Leigh v. Raby*,
  No. 3:22-cv-00034-MMD-CLB, 2024 WL 1345297 (D. Nev. Mar. 28, 2024) .....................13

*Marsh v. Or. Nat. Res. Council*,
  490 U.S. 360 (1989)...........................................................................................13

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983)............................................................................................13

*Nw. Env't Advocs. v. EPA*,
  537 F.3d 1006 (9th Cir. 2008) ............................................................................13

*Safari Club Int'l v. Haaland*,
  31 F.4th 1157 (9th Cir. 2022) ............................................................................22

*United States v. LKAV*,
  712 F.3d 436 (9th Cir. 2013) .............................................................................22

*W. Rangeland Conservation Ass'n v. Zinke*,
  265 F. Supp. 3d 1267 (D. Utah 2017)..........................................................passim

**Statutes**

5 U.S.C. § 706(2)(A)...........................................................................................12

5 U.S.C. § 706(2)(C)...........................................................................................12

16 U.S.C. § 1331...................................................................................................2

16 U.S.C. § 1333(a)...............................................................................................3

16 U.S.C. § 1332(c)...............................................................................................3

16 U.S.C. § 1333(b)(1)..........................................................................................3

16 U.S.C. § 1333(b)(2) ................................................................................passim

16 U.S.C. § 1333(b)(2)(B)........................................................................3, 22, 23

31 U.S.C. § 1341.................................................................................................23

**Regulations**

43 C.F.R. § 4700.0-5(e) .........................................................................................3

43 C.F.R. § 4710.1.................................................................................................3

43 C.F.R. § 4710.3-1..............................................................................................3

**CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

The Court has consolidated Case No. 3:23-cv-00204-ART-CLB ("*Colvin I*") and Case No. 3:23-cv-00505-ART-CLB ("*Colvin II*") and entered a scheduling order for consolidated merits briefing. Dkt. 18. The cases each bring one claim under the Administrative Procedure Act ("APA") Section 706(2) and the Wild Free Roaming Horses and Burros Act ("the Wild Horse Act") against the same Federal Defendants[1] challenging similar aspects of two wild horse gather plans and decisions. Pursuant to Federal Rule of Civil Procedure 56, Federal Defendants cross-move for summary judgment on Plaintiffs Colvin & Sons, Inc.'s and Stone Cabin Ranch, Inc.'s claims in both cases. The grounds for this motion are delineated in the memorandum below.

Federal Defendants respectfully request that the Court deny Plaintiffs' motion for summary judgment, Dkt. 23, grant Federal Defendants' cross-motion for summary judgment, and enter judgment for Federal Defendants on all claims in *Colvin I* and *Colvin II*.

---

[1] Federal Defendants are Debra Haaland, in her official capacity as Secretary of the Interior; Tracy Stone-Manning, in her official capacity as Director of the Bureau of Land Management ("BLM"); Jon Raby, in his official capacity as the Nevada State Director of BLM; Doug Furtado, in his official capacity as District Manager for the Battle Mountain District, Nevada, BLM; and Perry B. Wickham in his official capacity as the Field Manager for BLM's Tonopah field office.

## MEMORANDUM IN SUPPORT

## INTRODUCTION

This consolidated case involves two decisions by BLM to gather wild horses in Nevada. Despite the convoluted nature of Plaintiffs' complaints and opening motion, their challenge is quite narrow. They do not dispute the analysis, reasoning, or determinations underlying either decision by BLM. Instead, they mischaracterize a few words in each plan adopted by BLM to claim that BLM's decisions do not comply with the Wild Horse Act's mandate to immediately conduct necessary removals of excess animals.

Plaintiffs' challenges are misguided and meritless. As shown below, Plaintiffs' arguments hinge on mischaracterizations of BLM's actions and a misunderstanding of the scope of review under APA Section 706(2). Once BLM's actions are properly understood, it is clear that BLM's decisions comply with the Wild Horse Act and APA, and that judgment should be entered in favor of Federal Defendants.

## BACKGROUND

### I.    LEGAL BACKGROUND

In 1971, Congress passed the Wild Horse Act, 16 U.S.C. § 1331 *et seq.*, because it was concerned that wild horses were vanishing from the West and wished to preserve these animals as "living symbols of the historic and pioneer spirit of the West." 16 U.S.C. § 1331. To accomplish this task, it directed the Secretary of the Interior to provide for their protection and management. *Id.* Congress amended the Wild Horse Act in 1978 because horses were reproducing too quickly, leading to overpopulation and deterioration of range health. H.R. Rep. No. 95-1122, at 21 (1978). The 1978 amendments to the Wild Horse Act provided the Secretary with greater authority and discretion to manage and remove excess horses. *See Am. Horse Prot. Ass'n v. Watt*, 694 F.2d 1310, 1316–18 (D.C. Cir. 1982).

The Wild Horse Act grants the Secretary jurisdiction over all wild free-roaming horses and burros on federal lands and directs the Secretary to "manage wild free-roaming horses and burros in a manner that is designed to achieve and maintain a thriving natural ecological balance

on the public lands." 16 U.S.C. § 1333(a). "The Bureau (as the Secretary's delegate) carries out this function in localized 'herd management areas' ('HMAs')." *Fund for Animals v. BLM*, 460 F.3d 13, 15 (D.C. Cir. 2006); *see* 16 U.S.C. § 1332(c); 43 C.F.R. § 4710.3-1. HMAs are established in accordance with broader land use plans. *Fund for Animals*, 460 F.3d at 15; *see also* 43 C.F.R. § 4710.1. BLM is afforded significant discretion, based on the input of their expert resource specialists, to determine "appropriate management levels" ("AMLs") for the wild horse populations they manage. *Fund for Animals*, 460 F.3d at 16; 16 U.S.C. § 1333(b)(1). An AML is generally "expressed as a population range with both an upper and lower limit, within which wild horses or burros can be managed for the long term." *Am. Wild Horse Pres. Campaign v. Jewell*, 847 F.3d 1174, 1178 (10th Cir. 2016) (cleaned up).

BLM has broad discretion over how it achieves and maintains AML—it can do so "by the removal or destruction[2] of excess animals, or other options (such as sterilization, or natural controls on population levels)." *See* 16 U.S.C. § 1333(b)(1); *In Def. of Animals v. U.S. Dep't of Interior*, 751 F.3d 1054, 1065 n.16 (9th Cir. 2014). If BLM determines that there is an overpopulation of wild horses in an HMA and action is necessary to remove excess animals, BLM "shall immediately remove excess animals from the range so as to achieve [AMLs]." 16 U.S.C. § 1333(b)(2); *In Def. of Animals*, 751 F.3d at 1062.

The Wild Horse Act specifies that BLM shall "humanely" capture and remove excess horses, and that BLM must ensure that excess animals receive "humane treatment and care (including proper transportation, feeding, and handling)." 16 U.S.C. § 1333(b)(2)(B). BLM regulations define "humane treatment" as "handling compatible with animal husbandry practices accepted in the veterinary community, without causing unnecessary stress or suffering to a wild horse or burro." 43 C.F.R. § 4700.0-5(e); *see Leigh v. Jewell*, No. 3:11-cv-00608-HDM-WGC,

---

[2] "Congress has barred the BLM from euthanizing healthy excess horses for which there is no adoption demand ... by continually declining to appropriate funds for the destruction of these animals." *In Def. of Animals*, 751 F.3d at 1066 n.20 (citation omitted). Thus, the statute's language notwithstanding, "destruction" of healthy excess animals is not a management option for BLM.

2014 WL 31675, at *5 (D. Nev. Jan. 3, 2014) (finding that the Wild Horse Act's definition of humane "affords BLM discretion in conducting [] wild horse roundups").

## II.   FACTUAL AND PROCEDURAL BACKGROUND

### A. The Little Fish Decision and Gather Plan

BLM manages 245 million acres of public lands in the United States, including about 26.9 million acres managed as wild horse and burro habitat. The Little Fish Lake HMA is managed by BLM and contains 28,744 acres of private and public lands. LF_0011, 0015.[3] The HMA is about 70 miles northeast of Tonopah in Nye County, Nevada, and falls within the Little



Map 1. Little Fish Lake Joint Management Area.

---

[3] There is no prefix in the Bates numbering for the *Colvin I* record because it was produced before consolidation, and thus there was no need to distinguish it from the *Colvin II* record. For ease of reference, Federal Defendants refer to the Little Fish/*Colvin I* administrative record as "LF__(Number)," to conform with the Stone Cabin/*Colvin II* record's "SC_(Number)" format.

Fish Lake Valley, portions of which are public lands managed by BLM and portions of which are national forest system lands managed by the United States Forest Service. LF_0011. The Forest Service portion of Little Fish Lake Valley includes the Little Fish Lake Wild Horse Territory ("WHT"), consisting of 88,297 acres of forest and private lands. LF_0011, 00115. Together, the Little Fish Lake HMA and Little Fish Lake WHT contain 117,041 acres and are jointly managed by the Forest Service and BLM as the Little Fish Lake Joint Management Area ("Little Fish JMA"), with historic interchange of wild horses between the HMA and WHT. *Id.*

The AML range for the Little Fish JMA is 79 to 132 wild horses. LF_0012. In March 2021, BLM conducted an aerial survey of the Little Fish JMA and estimated that the population was 138 wild horses in the HMA and 153 wild horses in the WHT, for a total estimated population of 291 wild horses. LF_0015. BLM estimates that the annual herd growth rate is approximately 20%—thus, after the 2022 foaling season, there would be around 350 wild horses within the Little Fish JMA. *Id.*

Based on these results, BLM began a process to determine whether excess wild horses are present in the Little Fish JMA, and whether removal of those excess animals is necessary. *See* 16 U.S.C. § 1333(b)(2). On May 11, 2022, pursuant to the National Environmental Policy Act ("NEPA") and Wild Horse Act, BLM issued a draft gather plan environmental assessment ("EA") for public review and comment. LF_0214. The draft EA analyzed both the BLM and Forest Service portions of the Little Fish JMA. LF_0217. BLM received over 7,000 comments, including a letter from Plaintiff Colvin & Sons. On August 2, 2022, BLM issued a Final Environmental Assessment ("Little Fish EA") and the Little Fish Decision Record ("Little Fish Decision"). LF_0009, LF_0001.[4]

The Little Fish EA explains that "[b]ased upon all current information" available to the agency, BLM "has determined that excess wild horses exist" within Little Fish JMA, and that

---

[4] On January 10, 2023, the Forest Service issued its separate decision for implementation of the proposed action in the Little Fish EA to remove excess horses (in cooperation with BLM) from forest lands in the Little Fish JMA. *See* Decision Notice and Finding of No Significant Impact for Little Fish Lake Joint Management Area Wild Horse Gather Plan, FOREST SERVICE, January 10, 2023, available at: https://www.fs.usda.gov/project/?project=62070&exp=overview (last visited May 2, 2024). Plaintiffs do not challenge this decision.

FED. DEFENDANTS' CROSS-MOTION
& RESPONSE TO PLAINTIFFS' MOTION          5

the "excess wild horses need to be removed in order to achieve the established AML, restore a thriving natural ecological balance . . . and prevent further degradation of range resources." LF_0015. The Little Fish EA states that the proposed action ("Little Fish Gather Plan") involves three "distinct" activities:

1. Initially, gather and remove excess wild horses to achieve low AML either in a single first gather or over multiple follow-up gathers . . .
2. Administer and/or booster population control measures to gathered and released horses, along with sex ratio adjustment, to slow population growth and maintain the wild horse population within AML.
3. Conduct additional/maintenance gathers after the initial gather(s) to bring wild horse population back to low AML if the population grows to again exceed AML during the 10-year plan life after low AML was achieved.  LF_0019.

The first component of the Little Fish Gather Plan is to initially gather and remove horses as "expeditiously as possible" to achieve low AML. LF_0020. Though BLM plans to "promptly remove all excess animals above low AML," the Little Fish Gather Plan explains that BLM is unlikely to achieve this goal in one initial gather due to several factors. *Id*. These include "gather efficiency limitations (animals evading capture during the gather operations), logistical limitations (e.g. weather conditions, terrain and large geographic area to be gathered), population inventory undercounts, space capacity limitations (for holding removed animals), and limited contractor availability and expertise[.]" *Id*. Thus, the Little Fish Gather Plan explains that "it often requires more than a single gather to bring the population to low AML[.]" *Id.* Accordingly, if low AML cannot be achieved in the first gather, BLM would return "to remove the remaining excess horses above low AML in one or more (if necessary) follow-up gathers." *Id.*

As to the second component—population controls—the Little Fish Gather Plan explains that BLM would implement these controls as "part of the initial gather[,]" but that "[f]ollow-up gathers would also continue over the 10-year period to gather a sufficient number of wild horses to implement the population control component[.]" LF_0020–21. The Little Fish Gather Plan notes that: "Funding limitations and competing national priorities may impact the timing and ability to gather and conduct population control components of the Proposed Action." LF_0021; *see also* LF_0021–23 (detailing various population control methods).

The third component of the Little Fish Gather Plan is "maintenance gathers" to be conducted after the initial gathers to achieve low AML. These are intended to bring the population back to AML if AML is exceeded again over the ten-year life of the plan and to facilitate the population control components. LF_0019 ("[O]ver a 10-year period after the initial gather(s) have achieved low AML, [BLM will] conduct maintenance gathers and apply fertility control methods to maintain population at AML.").

Accordingly, while the Little Fish Gather Plan spans ten years, the first component—initial gather or gathers to achieve low AML—will occur as soon as logistically possible. Only the population control and maintenance gather components are contemplated to occur over ten years. *Id.*; *see also* LF_0020 (explaining that ten years is necessary to "apply population control measures" and that "[s]ince vegetative and riparian recovery occurs slowly, even after the immediate overpopulation has been addressed and low AML has been achieved," BLM will conduct maintenance gathers to maintain AML "during the 10-year decision period to ensure range recovery").

The Little Fish Decision authorizes implementation of the Little Fish Gather Plan. LF_0002.

### B.  The Stone Cabin Decision and Gather Plan

The Stone Cabin Complex is managed by BLM and includes the Stone Cabin HMA and Saulsbury HMA. SC_6185. The Stone Cabin HMA is about 30 miles east of Tonopah in Nye County, Nevada, and contains 407,706 acres. SC_6185–86. The Saulsbury HMA contains 135,018 acres and is divided into a southern and northern parcel. *Id.* The southern parcel is immediately west of the Stone Cabin HMA and south of Highway 6. SC_6185. The northern parcel is east of the Stone Cabin HMA and north of Highway 6. *Id.* The Monitor WHT is located between the Saulsbury and Stone Cabin HMAs. *Id.* Although there is some interchange of wild horses between the Stone Cabin Complex and the Monitor WHT, the Monitor WHT is managed solely by the Forest Service—i.e., it is not part of a jointly managed JMA—and is thus outside the scope of BLM's Stone Cabin Decision and Gather Plan. *Id.*



Map 1. Gather area for the Stone Cabin Complex wild horse gather.

5

SC_6187

The AML range for the Stone Cabin Complex is 242 to 404 wild horses. SC_6188. In July 2021, BLM conducted an emergency resource flight before an emergency gather within the Stone Cabin HMA, and observed 432 horses on the north side of the Stone Cabin HMA and 233 horses on the Saulsbury HMA. *Id.* This was the direct count observed by BLM and did not account for unseen horses that were likely present. *Id.* Extrapolating from the observed direct count, BLM estimates that the total 2021 population was about 1,097 total wild horses in the Stone Cabin Complex, and 931 in the Fall of 2022. *Id.* The Fall 2022 estimate was made by taking the 2021 estimate, subtracting the 321 horses gathered during the 2021 emergency gather on the Stone Cabin HMA, and applying the estimated 20% herd growth rate. *Id.*

Based on these results, BLM began a process to determine whether excess wild horses are present in the Stone Cabin Complex, and whether removal of those excess animals is necessary. *See* 16 U.S.C. § 1333(b)(2). On October 25, 2022, pursuant to NEPA and the Wild Horse Act, BLM issued a draft gather plan EA for public review and comment. SC_1642. BLM received over 1,400 comments, including from Plaintiffs Colvin & Sons and Stone Cabin Ranch. On April 11, 2023, BLM issued a Final Environmental Assessment ("Stone Cabin EA") and the Stone Cabin Decision Record ("Stone Cabin Decision"). SC_6182; SC_6174.

Like the Little Fish EA, the Stone Cabin EA explains that BLM has determined, based on "all current information available" to it, that excess horses exist within the Stone Cabin Complex and that such excess wild horses "need to be removed in order to achieve the established AML, restore a thriving natural ecological balance . . . and prevent further degradation of rangeland resources." SC_6189. The Stone Cabin EA outlines the proposed action ("Stone Cabin Gather Plan") and explains that, like the Little Fish Gather Plan, it involves three "distinct" components:

1. Initially, gather and remove excess wild horses to achieve low AML within the proposed gather area either in a single first gather or with a follow-up gather(s) if all excess animals are not captured and removed in a single initial gather . . .
2. Over the 10-year period, apply population growth suppression methods . . . to gathered and released horses over multiple gathers. . .
3. Over the 10-year period . . . conduct[] additional/maintenance gathers after the initial gather(s) to bring wild horse population back to low AML if the population grows to again exceed high AML. . . SC_6193.

Like the Little Fish Gather Plan, the first component of the Stone Cabin Gather Plan is to immediately gather and remove the excess wild horses from the Stone Cabin Complex. *See id.*; *see also* SC_6365 ("BLM's plan is to immediately remove all excess animals above AML . . ."). Again, BLM explains that several logistical factors can affect BLM's ability to achieve AML with a single gather, including gather efficiencies, population undercounts, weather conditions, limited contractor availability, and space to hold gathered horses. SC_6193–94. Accordingly, if "low AML is not achieved with the first gather," BLM would return to the Stone Cabin Complex "to remove remaining excess horses above low AML in one or, if necessary, more follow-up gathers." SC_6194.

Likewise, BLM explains that the second component of the Stone Cabin Gather Plan—population controls—will be implemented over ten years and will involve BLM conducting multiple gathers to administer the population controls to the horses, and then releasing those horses back onto the Stone Cabin Complex. SC_6193–94. BLM again notes that: "Funding limitations and competing national priorities may impact the timing and ability to gather and conduct the population control components of the Proposed Action." SC_6194.

Finally, the third component of the Stone Cabin Gather Plan is maintenance gathers that will take place "after the initial gather(s)" and that would be intended to bring the wild horse population "back to low AML if the population grows to again exceed high AML during the 10-year plan life after low AML was achieved[.]" SC_6193.

Accordingly, just like the Little Fish Gather Plan, the first component of the Stone Cabin Gather Plan—initial gather or gathers to achieve low AML—will occur as soon as logistically possible. Only the population control and maintenance gather components are contemplated to occur over ten years. *See* SC_6194.

The Stone Cabin Decision authorizes implementation of the Stone Cabin Gather Plan. SC_6175.

**C. Plaintiffs' Claims**

Plaintiffs' claims center on a few discrete statements in each Gather Plan. *Colvin I* is brought only by Colvin and challenges the Little Fish Decision. *Colvin II* is brought by Colvin and Stone Cabin Ranch and challenges the Stone Cabin Decision. Plaintiffs do not lodge any substantive challenge to BLM's analyses, AMLs, or population counts in the Gather Plans, EAs, or Decisions.

First, Plaintiffs take issue with BLM stating in each Gather Plan that "[f]unding limitations and competing national priorities may impact the timing and ability to gather and conduct population control components of the Proposed Action[s]." LF_0020–21; SC_6194; *see* Dkt. 1 ("*Colvin 1* Complaint") ¶ 36; Case No. 3:23-cv-00505-ART-CLB, Dkt. 1 ("*Colvin II* Complaint") ¶ 42. Second, Plaintiffs take issue with each Gather Plan stating that BLM's ability to attain AML during a single initial gather may be affected by, among several other factors,

whether BLM has sufficient space to hold removed horses. LF_0020 (noting that plan is to "promptly remove all excess animals above low AML," but that it is "unlikely that a single gather can achieve this[,]" including due to "space capacity limitations (for holding removed animals)"); SC_6194 (noting, among other factors, "off-range corral space availability may not allow for the attainment of low AML during a single initial gather"); *see Colvin I* Complaint ¶ 36; *Colvin II* Complaint ¶ 42.

Plaintiffs characterize the funding/priorities and space capacity language as "off-site conditions" that BLM has placed on its duty to "immediately remove excess animals from the range so as to achieve [AML]" after determining there is an overpopulation of wild horses in an HMA, and that action is necessary to remove excess animals under 16 U.S.C. § 1333(b)(2). *See Colvin I* Complaint ¶ 36; *Colvin II* Complaint ¶ 42; Dkt. 23 at 25. Plaintiffs claim that BLM is interpreting or applying the funding/priorities and space capacity language to delay gathers. *See, e.g.*, Dkt. 23 at 4; *id.* at 30; *id.* at 40. But Plaintiffs concede that it is proper for BLM to consider some factors (which Plaintiffs dub "on-site conditions") when deciding the appropriate time to remove excess animals to achieve AML. *See, e.g.*, *id.* at 36; *see also id.* at 5.

Plaintiffs bring one claim under APA Section 706(2)(A) and (2)(C) in both cases and ask the Court to "hold unlawful" BLM's Little Fish and Stone Cabin Decisions based on the funding/priorities and space capacity language in the Gather Plans. *Id.* at 5; *Colvin I* Complaint ¶ 66; *Colvin II* Complaint ¶ 79.

The Parties have agreed to bifurcate the merits and remedy. *See* Dkt. 19 at 3–4. That said, Plaintiffs apparently do not seek to vacate or set aside the entirety of the Little Fish or Stone Cabin Decisions, but merely the "conditions" in the Gather Plans to which they object—the funding/priorities and space capacity language. *See Colvin I* Complaint at 22; *Colvin II* Complaint at 29. Then, they presumably will seek injunctive relief to compel "implementation" of the Decisions "subject only to 'on-site' conditions." *Id.*; *see also* Dkt. 23 at 39. Because the Parties have agreed to defer consideration of remedy, Federal Defendants reserve their arguments about whether Plaintiffs' requested remedy is available under APA Section 706(2), the Wild

Horse Act, or otherwise appropriate. Ultimately, as explained, the Court need not reach remedy because Plaintiffs fail to show that BLM has violated the Wild Horse Act or APA.

### D. Procedural Background

*Colvin I* was filed on May 17, 2023. On September 7, 2023, the Parties submitted a Joint Case Management Report, Dkt. 13, and the Court adopted the scheduling order proposed by the Parties, Dkt. 14. Pursuant to the initial scheduling order, Federal Defendants lodged the administrative record for *Colvin I* on October 13, 2023. Dkt. 15.

*Colvin II* was filed four days later. Since the cases challenge nearly identical language in BLM's Little Fish and Stone Cabin Gather Plans, the Parties jointly moved to consolidate *Colvin II* with *Colvin I*. Dkt. 17. On December 1, 2023, the Court granted the Parties' motion, consolidated the actions, administratively closed *Colvin II*, and directed that all future filings be made in *Colvin I*. Dkt. 18. The Court also adopted the Parties' proposed scheduling order for the consolidated case, which set out a schedule for lodging the *Colvin II* administrative record and for cross-summary judgment motions on the merits. Dkt. 19. Federal Defendants answered the *Colvin II* Complaint on December 22, 2023, Dkt. 20, and lodged the administrative record for *Colvin II* on January 26, 2024, Dkt. 21.

### STANDARD OF REVIEW

Wild Horse Act claims are reviewed under the judicial review provisions of the APA, 5 U.S.C. §§ 701–06. *See In Def. of Animals,* 751 F.3d at 1061. As relevant here, APA Section 706(2) provides that a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . [or] in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A), (C).

Section 706's "arbitrary and capricious" standard of review is narrow—the Court cannot "substitute its judgment for that of the agency." *Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 416 (1971). The burden of proof remains on the plaintiff. *Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976). The "arbitrary and capricious" standard is necessarily deferential. A decision is arbitrary and capricious only "if the agency has relied on factors which Congress has not intended

it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008). In other words, there must be a "clear error of judgment." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989). "[A] reviewing court must generally be at its most deferential" when reviewing determinations involving agencies' technical expertise and scientific judgments. *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983).

An agency action is "not in accordance with law," if it conflicts with the language of the substantive statute at issue. *See Nw. Env't Advocs. v. EPA*, 537 F.3d 1006, 1014 (9th Cir. 2008). Likewise, an agency action is "in excess of statutory jurisdiction, authority, or limitation," if the action is not "congruent" with such substantive statute. *See Leigh v. Raby,* No. 3:22-cv-00034-MMD-CLB, 2024 WL 1345297, at *8 (D. Nev. Mar. 28, 2024).[5]

## ARGUMENT

BLM's Decisions—and the Gather Plans they adopt—are reasonable and comply with the Wild Horse Act. Plaintiffs do not allege any errors in BLM's analyses or determinations. Instead, they nitpick and mischaracterize to bring a convoluted challenge that BLM's actions do not comply with the Wild Horse Act's requirement to immediately conduct necessary removals of excess animals. Plaintiffs' claims are meritless.

First, Plaintiffs' claims are based on mischaracterizations of each Gather Plan. The funding/priorities sentence about which Plaintiffs complain pertains only to the population control components of each Gather Plan—it does not relate to the initial gather or gathers to achieve

---

[5] Review under these standards can involve statutory interpretation and thus application of *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). *See Nw. Env't Advocs.*, 537 F.3d at 1014. But as explained below, Federal Defendants' actions comply with the Wild Horse Act's plain language and meaning, and there is no need for the Court to engage in *Chevron* analysis. *See Leigh*, 2024 WL 1345297, at *7–8 (finding timing of BLM gather plan was neither "contrary to the law" nor in excess of statutory authority because it did not conflict with the Wild Horse Act, without engaging in *Chevron* analysis).

AML as soon as logistically possible. Moreover, neither the funding/priorities sentence nor the space capacity statement are "conditions" on any action—both simply recite factors that may affect the timing of certain components of each Gather Plan. And Plaintiffs misapprehend the scope of the Court's review under Section 706(2) in trying to use post-decisional facts to argue that BLM is delaying gathers based on the funding/priorities and space capacity language.

Second, BLM's Gather Plans and Decisions comply with the Wild Horse Act. BLM has discretion to determine the appropriate timing for gathers to remove excess animals to ensure such gathers are safe, effective, humane, and comply with the Wild Horse Act. BLM's actions fall within this discretionary space and the cases relied on by Plaintiffs are distinguishable.

Thus, the Court should deny Plaintiffs' motion for summary judgment and grant Federal Defendants' cross-motion for summary judgment.

I.   **Plaintiffs' Claims Rest on Mischaracterizations of the Gather Plans and Facts Outside the Scope of the Court's Review.**

Plaintiffs' claims rest on mischaracterizations of BLM's actions and issues outside the scope of the Court's review under APA Section 706(2). Before Federal Defendants can explain that BLM's actions comply with the Wild Horse Act, they must correct these errors underlying Plaintiffs' claims and arguments.

A. **The Funding/Priorities Sentence Relates Only to the Population Control Components of Each Gather Plan, not the Initial Gathers to Reach AML.**

The Wild Horse Act provides that once BLM determines that there is an overpopulation of wild horses in an HMA and that action is necessary to remove excess animals, BLM "shall immediately remove excess animals from the range so as to achieve [AMLs]." 16 U.S.C. § 1333(b)(2). Thus, the duty for BLM to act "immediately" applies only to the first component of each Gather Plan—necessary removals of excess animals to achieve AML. It does not apply to the population control components. *See W. Rangeland Conservation Ass'n v. Zinke*, 265 F. Supp. 3d 1267, 1282–83 (D. Utah 2017) (noting that once BLM makes the excess determination and

decides removal is necessary, it "must eschew other management techniques and address the overpopulation through removal").

Plaintiffs' claims are based on their (incorrect) claim that the Gather Plans do not fulfill BLM's duty to "immediately" gather horses to achieve AML. *See* Dkt. 23 at 25, 31–39. But the funding/priorities sentence they focus on relates only to the population control component of each Gather Plan, not the initial gathers to achieve AML. This is clear from the plain language of the identical sentences in each Gather Plan: "Funding limitations and competing national priorities may impact the timing and ability to gather and conduct *population control components* of the Proposed Action." LF_0021 (emphasis added); SC_6194. And the sentences are each in paragraphs that discuss only the population control components. *See id.*[6]

As explained above, the population control components involve gathering and releasing horses over ten years to apply various population growth suppression methods to maintain AML and a thriving natural ecological balance. *See* SC_6193–94; LF_0020–21. These components are "distinct" from the first component of each Gather Plans: removal of excess animals to achieve AML as soon as logistically possible through one or multiple initial gathers. LF_0019; SC_6193. Thus, Plaintiffs' primary argument—that BLM violated the Wild Horse Act by "conditioning" removals of excess animals on funding or priorities—misapprehends the Gather Plans.

Plaintiffs point out that in the Little Fish draft EA, BLM included language saying that initial gathers to achieve AML may depend on "national priorities" or "resources," only to remove this language in the final Little Fish EA, while keeping the funding/priorities sentence relating to the population control component. *Compare* LF_0225–26, *with* LF_0019–20. Similarly, language in the Stone Cabin draft EA that could be read to imply that initial gathers would depend on funding was not carried over to the final Stone Cabin EA, while BLM again kept the funding/priorities sentence relating to the population control component. *Compare* SC_1653–54, *with* SC_6193–94. Contrary to Plaintiffs' arguments, these changes reinforce the plain reading

---

[6] While the priorities/funding sentences do include the word "gather," this refers to the gathers necessary to implement the population control measures over the 10-year life of the Gather Plans, not to the initial gather or gathers to achieve AML. *See* SC_6193–94; LF_0020–21.

that the funding/priorities sentence in each Gather Plan does not apply to the initial gather or gathers to achieve AML. Rather, it applies only to the population control components, as the final versions of each EA/Gather Plan make clear.

Accordingly, Plaintiffs' claims that BLM has improperly conditioned necessary removals of excess animals on priorities or funding misread the Gather Plans.

**B. The Decisions and Gather Plans Do Not Condition Initial Gathers on Funding, Priorities, or Space Capacity, and Plaintiffs Improperly Rely on Facts Outside the Scope of the Court's Review to Argue Otherwise.**

Plaintiffs' characterization of the funding/priorities and space capacity language as "conditions" to any BLM action under the Gather Plans is false. *See, e.g.*, Dkt. 23 at 30. And their efforts to support this point improperly rely on characterizations and facts outside the scope of the Court's review under APA Section 706(2).

As explained above, the funding/priorities sentence relates only to the population control components of each Gather Plan. In any case, the Gather Plans do not "condition" anything on funding or priorities—they merely state that such issues "*may impact* the timing" of certain actions. *See* SC_6194 (emphasis added); LF_0021 (emphasis added). Likewise, each Gather Plan notes various logistical concerns that could affect BLM's ability to achieve AML in a single gather, including gather efficiencies, population undercounts, weather conditions, limited contractor availability, and whether BLM has sufficient space to hold gathered horses. SC_6193; LF_0020. Plaintiffs object to only the final concern. But neither of the Gather Plans expressly or impliedly "condition" implementation of initial gathers to remove excess horses on space capacity, as Plaintiffs claim. The Gather Plans merely note that it is one of many factors that could, in practice, affect BLM's ability to achieve AML in a single gather.

Other than the presence of the funding/priorities and space capacity language in each Gather Plan, Plaintiffs point to nothing in the administrative records showing that BLM's Gather Plans "condition" or otherwise intend to delay removals of excess animals on these considerations. Instead, Plaintiffs rely on the fact that BLM has not yet implemented initial removals under either Decision to show that BLM is conditioning gathers on funding, priorities or space capacity limitations.

Indeed, Plaintiffs' framing of their argument essentially concedes that the text of the Gather Plans and Decisions do not condition initial gathers on anything: "[A]s applied or as interpreted by the Defendants, the Decision Records violate the [Wild Horse Act] and fail to 'immediately remove excess animals' pursuant to the [Wild Horse] Act." Dkt. 23 at 3–4 (emphasis removed). Plaintiffs argue that Federal Defendants "have failed to conform to their own action plans" and note that it has "been 20 months (and counting) since the first Decision Record was issued." *Id.* at 5 (emphasis removed); *see also id.* at 30 (same). Accordingly, the basis for Plaintiffs' challenge is not the Gather Plans or Decisions *as written*, but Plaintiffs' belief that BLM is "interpreting" the Gather Plans and Decisions to condition initial gathers on the funding/priorities and space capacity language. *See id.* at 40 ("Defendants unlawfully applied or interpreted their own Decision Records to allow them to rely upon [the funding/priorities and space capacity language] to not conform to their management plans to immediately remove the 'excess animals.'") (emphasis removed). Plaintiffs seem to impute that BLM is in fact conditioning gathers on this language because gathers have not yet occurred.[7]

But Plaintiffs have brought this case under APA Section 706(2), challenging each Decision as a final agency action. *See, e.g.*, *id.* at 26–27. And such a challenge is "limited to the administrative record in existence at the time of the agency's decision." *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 560 (9th Cir. 2000) (citation omitted); *see Friends of Animals v. BLM.*, 548 F. Supp. 3d 39, 59 (D.D.C. 2021) ("Because the administrative record is thus fixed as of December 2018, the Court can evaluate [plaintiff's] argument only in light of the record that existed at that time."). Thus, how BLM is subsequently "interpreting" or "applying" the Decisions or Gather Plans is irrelevant to an APA Section 706(2) challenge, as is whether any gathers have occurred. The Court's role is to evaluate the reasonableness of the challenged agency actions— i.e., the Decisions adopting the Gather Plans—and to do that, the Court's review is limited to the

---

[7] As explained, whether gathers have or have not taken place is outside the scope of the Court's review. But Plaintiffs' claim that any delay in implementing the Decisions is due to the language to which they object makes little sense considering that they do not object to a host of other factors BLM notes may impact the timing of initial gathers, including gather efficiencies, population undercounts, weather conditions, and limited contractor availability. *See id.* at 16.

FED. DEFENDANTS' CROSS-MOTION
& RESPONSE TO PLAINTIFFS' MOTION          17

substance of those decisions and BLM's supporting administrative records. As explained, Plaintiffs identify nothing in the Gather Plans, Decisions, or administrative records to indicate that BLM plans to condition removals of excess animals on funding, priorities, or space capacity. If Plaintiffs want to argue that BLM is, in fact, unreasonably delaying implementation of the gathers based on these factors, they brought the wrong claims.[8]

Accordingly, Plaintiffs' claims are built upon misrepresentations of BLM's actions and a misunderstanding of the proper scope of review under APA Section 706(2).

## II.     BLM's Gather Plans and Decisions are Reasonable and Comply with the Wild Horse Act.

BLM's Decisions and Gather Plans for the Little Fish JMA and Stone Cabin Complex comply with the Wild Horse Act and are neither arbitrary nor capricious. Thus, the Court should uphold BLM's actions against Plaintiffs' APA Section 706(2) challenges, and grant judgment for Federal Defendants.

### A.   The Wild Horse Act Affords BLM Some Discretion as to the Timing of Gathers to Remove Excess Horses and Achieve AML.

While Plaintiffs' position can be hard to parse, their motion claims at various points that once the agency decides that removals are necessary, BLM has "no discretion" on the timing of gathers to remove excess animals and achieve AML. *See, e.g.*, Dkt. 23 at 28. But BLM retains discretion under the Wild Horse Act to plan and implement safe, efficient, and effective removals.

The Wild Horse Act provides that once BLM makes an excess determination and concludes that it is necessary to remove excess horses, BLM "shall immediately remove excess animals from the range so as to achieve [AMLs]." 16 U.S.C. § 1333(b)(2). There is no express timeframe in the Wild Horse Act during which BLM must act to remove excess horses "immediately." But a few courts have examined its meaning.

---

[8] Plaintiffs' arguments would make more sense if they sued under APA Section 706(1) to compel "unreasonably delayed" agency action. *See, e.g.*, *Friends of the Clearwater*, 222 F.3d at 560 (noting that under Section 706(1), "review is not limited to the record as it existed at any single point in time"). Of course, Federal Defendants dispute that BLM has unreasonably delayed implementation of the Decisions. But Plaintiffs have expressly disavowed bringing a Section 706(1) claim, both in their motion, *see* Dkt. 23 at 26–27, 34–35, and in meet and confers related to the joint case management plan for *Colvin I*, Dkt. 13.

In *Western Rangeland*, the court explained that an "overly literal interpretation" of "immediately"—i.e., that BLM must remove horses "without delay"—would belie "practical reality." 265 F. Supp. 3d at 1283. The court noted some of the practical concerns that may delay removals, including that BLM generally cannot gather during foaling season, inclement weather, and gather efficiencies. *Id.* Additionally, the court explained that "[e]ven when timing and conditions are right, BLM must carefully plan and execute the gather and removal so as to avoid eroding the target herd's physical health, social cohesion, or genetic viability." *Id.* at 1284. The court observed that "practical realities" prohibit an interpretation of the Wild Horse Act requiring "removal[s] of excess wild animals without *any* intervening delay[,]" because that "interpretation would contravene the ultimate purposes of the [Wild Horse Act] by forcing BLM to act recklessly and without regard for the continuing viability or humane treatment of creatures it is specifically tasked with preserving." *Id.* (citation omitted). Thus, while it requires prompt action by BLM, the Court found that the Wild Horse Act's "mandate to 'immediately remove' must therefore include some discretionary space in which BLM may plan and execute safe, efficient, and effective removals consistent with the broader purposes of the [Wild Horse Act] and in compliance with other statutory duties." *Id.* at 1284–85.

Other courts have agreed with *Western Rangeland*'s reading that "immediately" necessarily affords BLM some discretionary space to plan safe, efficient, and effective necessary removals of excess animals. *See Friends of Animals v. BLM*, No. CV 18-2029 (RDM), 2024 WL 1344424, at *22 (D.D.C. Mar. 30, 2024) (agreeing with *Western Rangeland* that BLM has discretion as to the timing of necessary removal actions if required to "'plan and execute the action safely and effectively'") (citation omitted); *Friends of Animals v. Culver*, 610 F. Supp. 3d 157, 170 (D.D.C. 2022) (same). Accordingly, to the extent that Plaintiffs' argument insists that BLM has no discretion in the timing of necessary removals, this should be rejected.

### B. BLM Acted Within its Discretion to Plan Safe, Effective, and Efficient Removals of Excess Animals that Comply with the Wild Horse Act.

As explained, the Gather Plans here provide that BLM will institute an initial gather or gathers to achieve AML as soon as feasible. LF_0020–21; SC_6365. Each Gather Plan spans ten

years, but that timeframe relates only to the population control and maintenance gathers components. LF_0019–20; SC_6193. While BLM intends to reach AML in one initial gather, the Gather Plans note that several factors, including gather efficiencies, population undercounts, weather conditions, limited contractor availability, and sufficient space to hold gathered horses, could affect BLM's ability to do so. LF_0020; SC_6193–94.

Thus, the timing of necessary removals of excess animals contemplated by the Gather Plans fall well within the discretionary space afforded to BLM by the Wild Horse Act. Each Gather Plan provides that BLM will institute component one—initial gather or gathers to achieve AML—as soon as logistically possible while also ensuring that BLM is able to gather horses in a safe, effective, and humane manner. Plaintiffs rely on two cases to argue that BLM's Gather Plans violate the Wild Horse's command to "immediately remove" excess horses. Both cases are distinguishable and, if anything, show that BLM's actions here are reasonable and comply with the Wild Horse Act.

Plaintiffs primarily rely on *Western Rangeland*. There, plaintiffs sued BLM under APA Section 706(1), claiming that BLM had unreasonably delayed its duty to remove excess horses from various HMAs. *See* 265 F. Supp. 3d at 1272. BLM's plan in *Western Rangeland* was to achieve AML by gradually removing excess animals through phased gathers over a six- to ten-year period. *Id.* at 1285–86. Ultimately, the court found that BLM had delayed its duty to immediately remove excess horses. The court held that the "phased" nature of BLM's plan to achieve AML in six-to-ten years through gradual, rather than immediate, removals violated the Wild Horse Act. *Id.* at 1286–87. While the mandate to immediately gather "must account for the practical realities of the removal process," the court found BLM's justification for why it needed "nearly a decade" to achieve AML in these HMAs, including budgetary constraints and limited holding space, unpersuasive. *Id.* at 1287–88.[9]

---

[9] After a thorough analysis of the relevant factors, including the extent and consequences of the delay and the administrative difficulties of implementing the action, the court concluded that BLM had not *unreasonably* delayed its duty to immediately remove excess horses. *See* 265 F. Supp. 3d at 1291 ("BLM's efforts to both successfully and sustainably manage wild horse populations pursuant to the [Wild Horse Act] are hindered by nigh-insurmountable administrative obstacles."). Thus, the court did not grant plaintiffs' request to compel BLM to institute gathers

After *Western Rangeland*, a court within this District upheld a 10-year gather plan against challenge under the Wild Horse Act and was affirmed by the Ninth Circuit. *See Friends of Animals v. Silvey*, 353 F. Supp. 3d 991, 1006 (D. Nev. 2018), *aff'd*, 820 F. App'x 513 (9th Cir. 2020). That case acknowledges *Western Rangeland* but does not directly engage with the meaning of "immediately." *See id.* at 1005, 1009.

In any event, *Western Rangeland* is distinguishable. The Little Fish and Stone Cabin Gather Plans do not authorize "gradual removals" over six-to-ten years to achieve AML. *See* 265 F. Supp. 3d at 1286–87. As noted above, both Gather Plans provide that initial gathers to achieve AML will occur as soon as logistically possible. *See, e.g.*, LF_0020 ("[T]he agency's plan is to promptly remove all excess animals above low AML . . ."); SC_6365 ("BLM's plan is to immediately remove all excess animals above AML . . ."). It is only the second and third components of each plan—population controls and maintenance gathers—that span ten years. *See* SC_6193 (laying out three components of plan, with "[o]ver the 10-year period" in only the second and third); LF_0019 ("[O]ver a 10-year period after the initial gather(s) have achieved low AML, conduct maintenance gathers and apply fertility control methods to maintain population at AML"). Thus, the Gather Plans here do not contemplate gradual removals to achieve AML over nearly a decade, and this basic fact distinguishes BLM's actions here from those at issue in *Western Rangeland*.

Ignoring this, Plaintiffs myopically focus on *Western Rangeland*'s statements about holding space and funding. *See* Dkt. 23 at 35–36.[10] As to holding space, *Western Rangeland* held only that BLM could not justify reaching AML gradually over the course of six-to-ten years based on a shortage of holding space for gathered animals. *See* 265 F. Supp. 3d at 1287. By contrast, the Gather Plans here explain that it is possible that holding space could impact BLM's ability to

---

of excess animals. *Id.* at 1297 (declining to "compel BLM to act" because of the "practical realities" faced by BLM, and the "inadvisability" of the court "injecting itself into wild horse and burro management in any significant capacity").

[10] Plaintiffs derive from *Western Rangeland* a confusing dichotomy between "on-site" and "off-site" conditions, claiming that BLM may rely on "on-site" conditions, but not "off-site" conditions. *See* Dkt. 23 at 36. Sometimes they also refer to "other off-site" conditions. *Id.* at 38. This dichotomy is not used in the case and only unnecessarily complicates Plaintiffs' claims.

achieve AML *in a single gather*, so prompt follow-up initial gathers to achieve AML may be necessary. LF_0020 ("While the agency's plan is to promptly remove all excess animals above low AML, it is unlikely that a single gather can achieve this because of . . . space capacity limitations (for holding removed animals)"); SC_6194 ("[G]ather efficiencies and other factors discussed above, as well as off-range corral space availability may not allow for the attainment of low AML during a single initial gather . . .").

More importantly, as discussed above, *Western Rangeland* observed that the duty to "immediately remove" includes "discretionary space" for BLM to "plan and execute safe, efficient, and effective removals" that comply with the Wild Horse Act. *Id.* at 1284. Put simply, BLM's planning and execution of safe, efficient, and effective removals consistent with the Wild Horse Act must consider the logistical needs of caring for removed horses. Indeed, the Wild Horse Act requires that, in "immediately remov[ing] excess animals" to achieve AML, BLM shall "humanely capture[] and remove[]" excess animals and ensure that they receive "humane treatment and care (including proper transportation, feeding, and handling)[.]" 16 U.S.C. § 1333(b)(2)(B). If BLM were to conduct a gather of excess animals without an appropriate facility where such animals could be humanely housed, this would not be a safe, efficient, or effective removal, nor would it be consistent with the Wild Horse Act's humane handling requirement or broader purpose. *See, e.g.*, *Am. Wild Horse Pres. Campaign*, 847 F.3d at 1178 (explaining that the statute was "enacted by Congress to ensure the survival" of wild horses). Thus, construing BLM's duty to "immediately" remove excess horses to preclude BLM from considering such needs, as Plaintiffs insist, would be illogical and conflict with other provisions of the Wild Horse Act. *United States v. LKAV*, 712 F.3d 436, 440 (9th Cir. 2013) ("Statutory interpretations which would produce absurd results are to be avoided.") (cleaned up); *Safari Club Int'l v. Haaland,* 31 F.4th 1157, 1168 (9th Cir. 2022) ("The words of a statute must be read in their context and with a view to their place in the overall statutory scheme.") (cleaned up).

As to *Western Rangeland*'s statements on budgetary constraints, the Gather Plans here do not condition removals of excess horses on funding as Plaintiffs claim. Rather, as explained above, the funding/priorities sentences they focus on relate only to the population control

components of each Gather Plan. But even if Plaintiffs' characterization were correct, it is absurd to suggest that BLM must plan to remove excess animals irrespective of whether it has funding to do so. Along with more fundamental issues,[11] if BLM gathered horses with insufficient funds, such a gather would hardly be safe, efficient, or effective. Indeed, like gathering without holding space, an ill-funded gather would conflict with the Wild Horse Act's mandate that BLM humanely handle excess animals. 16 U.S.C. § 1333(b)(2)(B). For example, in order to comply with this statutory mandate, each Gather Plan provides that "[a]ll gather and handling activities would be conducted in accordance with the standards set in the Comprehensive Animal Welfare Program ["CAWP"]." LF_0024; SC_6199 (same). The CAWP was designed with input from veterinary experts to ensure humane treatment of animals during and after gathers. *See* LF_3551; SC_1171. Without proper funding, it would essentially be impossible for BLM to follow these policies in gathering horses. Put simply, requiring BLM to gather animals without sufficient funding would "contravene the ultimate purposes of the [Wild Horse Act] by forcing BLM to act recklessly and without regard for the continuing viability or humane treatment of creatures it is specifically tasked with preserving." *See W. Rangeland*, 265 F. Supp. at 1284 (citations omitted).[12]

As explained, if Plaintiffs wanted to argue that BLM is unreasonably delaying removals of excess animals based on funding, priorities, or space capacity, they could have brought an APA Section 706(1) claim, as did the plaintiffs in *Western Rangeland*.[13] But they chose to proceed under APA Section 706(2), making *Western Rangeland*'s holding—that BLM (not unreasonably) delayed its duty to immediately remove excess animals—inapplicable. Under APA Section

---

[11] For example, Federal law prohibits agencies from expending funds that have not been appropriated. *See, e.g.*, 31 U.S.C. § 1341.

[12] *Western Rangeland*'s holding is factually and legally distinguishable. But if the Court agrees with Plaintiffs that the case can be read to prohibit BLM from considering space capacity or funding, the Court should disagree with that reasoning. Indeed, if read in the manner Plaintiffs suggest, *Western Rangeland* is internally inconsistent because having sufficient space and funding is necessary for BLM to gather excess animals safely, efficiently, and effectively in a manner that complies with the Wild Horse Act. *See* 265 F. Supp. at 1283.

[13] Notably, Plaintiffs cite an APA Section 706(1) case for the proposition that lack of funding is not a permissible justification for inaction which, like *Western Rangeland*, is inapt. *See* Dkt. 23 at 37–38 (citing *In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 549 (D.C. Cir. 1999) (a case brought under Section 706(1) for violating a statutory deadline)).

706(2), the Court's role is to evaluate whether the Decisions are arbitrary and capricious or contrary to the Wild Horse Act, not whether BLM has unreasonably delayed necessary removals. Plaintiffs cite no authority showing that the mere inclusion of the funding/priorities and space capacity language in each Gather Plan is arbitrary, capricious or contrary to the Wild Horse Act.

Indeed, the only APA Section 706(2) case on which Plaintiffs rely is *Culver*, which is easily distinguished. There, the plaintiff challenged a BLM decision that "approve[d] the 'phased' removal of excess wild horse and burros from [an] HMA over a ten-year period." 610 F. Supp. 3d at 165. As relevant here, plaintiff claimed that the "ten-year 'phased' approach" of the gather plan violated BLM's duty to "immediately" remove excess animals. *Id.* at 167. Because the court was reviewing BLM's actions under Section 706(2), it limited its review to the text of BLM's decision and gather plan. *See id.* at 169–70 (noting difference between review under Sections 706(2) and 706(1)). Thus, the court found that "the sole question" before it was "whether BLM may lawfully direct its employees to wait ten years to 'immediately' remove excess horses that BLM has determined must be removed." *Id.* at 170. The court held that the plan did not comply with the Wild Horse Act because "ten years in this instance simply cannot mean, as a matter of the plain language of the [Wild Horse Act], 'immediately.'" *Id.* at 171.[14]

*Culver* is not on point. The Gather Plans here do not direct BLM employees to "wait ten years" before conducting necessary gathers to achieve AML. *See id.* at 170. As explained, both Gather Plans provide for initial gathers to achieve AML as soon as logistically possible, and their ten-year timeframe relates only to the distinct population control and maintenance gather components. Moreover, while *Culver* endorsed *Western Rangeland*'s interpretation that "immediately" requires prompt action from BLM, it also adopted that case's reasoning that BLM maintains some discretionary space to plan safe and effective gathers. *See id.* For all the reasons discussed above, BLM's actions are well within that discretionary space.

---

[14] Like *Western Rangeland*, despite finding that BLM's gather plan did not contemplate swift enough removals, *Culver* did not order BLM to gather horses, as Plaintiffs seem poised to request as a remedy in these cases. *See* 610 F. Supp. 3d at 172–73.

Finally, a more recent decision reaffirms that BLM's actions here are reasonable and comply with its duty to "immediately" remove excess horses. In *Friends of Animals*, the plaintiff brought a similar challenge to *Culver*, claiming that BLM's long-term, phased gather plans did not comply with the duty to "immediately" remove excess horses. *See* 2024 WL 1344424, at *19 (explaining plaintiff's view that "the statutory command that the agency act 'immediately' precludes the adoption of long-term gather plans"). The Court disagreed, finding that while "immediately" "requires that the agency promptly begin the process of removing excess animals," it "does not require that it complete the process 'without interval of time[.]'" *Id.* at *20 ("[T]he statute requires [BLM] to 'immediately remove excess animals,' but does not require that it 'immediately remove [*all*] excess animals.'"). Thus, the court held that the Wild Horse Act permits BLM to adopt gather plans that contemplate "staged" gathers over a period of years to achieve AML in the first instance, so long as BLM plans to begin removing excess animals "as promptly as reasonably possible." *See id.* at *20–23. This only reinforces that BLM's Gather Plans here—which do not contemplate staged gathers over the course of years, but prompt initial gathers to achieve AML as soon as logistically possible—comply with the Wild Horse Act and are neither arbitrary nor capricious.

Accordingly, BLM's Decisions and Gather Plans for the Little Fish JMA and Stone Cabin Complex are lawful, reasonable, and should be upheld against Plaintiffs' misguided challenge.

## **CONCLUSION**

For all these reasons, the Court should deny Plaintiffs' motion for summary judgment, grant Federal Defendants' cross-motion, and enter judgment for Federal Defendants.

Dated: May 3, 2024                              Respectfully submitted,

                                                TODD KIM,
                                                Assistant Attorney General
                                                S. JAY GOVINDAN, Section Chief
                                                BRIDGET K. MCNEIL, Assistant Section Chief

                                                 */s/ Joseph W. Crusham*
                                                Joseph W. Crusham, Trial Attorney

CA Bar No. 324764
United States Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
P.O. Box 7611, Ben Franklin Station
Washington, D.C. 20044-7611
Telephone: (202) 307-1145
Email: joseph.crusham@usdoj.gov

JASON M. FRIERSON
United States Attorney
District of Nevada
Nevada Bar No. 7709
PATRICK ROSE
Assistant United States Attorney
Nevada Bar No. 5109
501 Las Vegas Blvd. So., Suite 1100
Las Vegas, Nevada 89101
(702) 388-6336
Patrick.Rose@usdoj.gov

*Attorneys for Federal Defendants*