1

2

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

3

4

5

6

7

8

| | |
|---|---|
| COLVIN & SON, LLC | Case No. 3:23-cv-00204-ART-CLB |
| Plaintiff, | ORDER GRANTING DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT (ECF No. 24) |
| v. | |
| DEB HAALAND, in her official Capacity as Secretary of the United States Department of the Interior et al | |
| Defendants. | |

9

10

11

12

13

14

15

16

17

In this consolidated case, Plaintiffs Colvin & Son, LLC and Stone Cabin Ranch sue Defendants, claiming that two wild horse gather plans and decisions violate the Wild Free Roaming Horses and Burros Act ("WHA") and the Administrative Procedure Act ("APA"). Before the Court are the parties' cross-motions for summary judgment (ECF Nos. 23, 24) and Defendants' motion for leave to file a document (ECF No. 28). For the reasons outlined below, the Court finds that neither of the gather plans and decisions violate the WHA or APA. Accordingly, the Court denies Plaintiffs' motion for summary judgment (ECF No. 23) and grants Defendants' cross-motion for summary judgment (ECF No. 24).

18

19

I.    **BACKGROUND**

**A. The Wild Free Roaming Horses and Burros Act**

20

21

22

23

24

25

26

27

28

The WHA tasks the Secretary of the Interior (acting through BLM) with "manag[ing] wild free-roaming horses and burros in a manner that is designed to achieve and maintain a thriving natural ecological balance on the public lands." 16 U.S.C. § 1333(a). The Act requires the Secretary to maintain an inventory of wild horses on given areas of public lands for the purpose of (1) setting "appropriate management levels [("AMLs")] of wild free-roaming horses and burros on these areas;" (2) determining "whether and where an overpopulation exists and whether action should be taken to remove excess animals;" and (3) deciding "whether [AMLs] should be achieved by the removal or destruction of

excess animals, or other options (such as sterilization, or natural controls on population levels)." *Id.* § 1333(b)(1). Pursuant to BLM regulations, the Bureau manages herds of wild horses and burros through "herd management areas" ("HMAs"). 43 C.F.R. § 4710.1.

### B. The Little Fish Decision and Gather Plan

The Little Fish Joint Management Area ("JMA"), which consists of over 100,000 acres of land in Nye County, Nevada, is jointly managed by the Forest Service and the BLM. LF_0011, LF_00115. The AML range for the Little Fish JMA is 79 to 132 wild horses. LF_0012. In 2021, BLM conducted an aerial survey of the Little Fish JMA and estimated that the population was 291 wild horses. LF_0015. Based upon these results and other information, BLM determined that excess wild horses exist within the Little Fish JMA. *Id.* In May 2022, BLM issued a draft gather plan environmental assessment for public review and comment. LF_0214. In August 2022, BLM issued a Final Environmental Assessment ("EA") and Decision Record. LF_009, LF_0001.

The Little Fish EA outlines BLM's proposed action for gathering and removing excess wild horses ("gather plan"). LF_0011. The gather plan involves "three distinct types of activities" over a ten-year period:

> 1. Initially, gather and remove excess wild horses to achieve low AML either in a single first gather or over multiple follow-up gathers. . . .
> 2. Administer and/or booster population control measures to gathered and released horses, along with sex ratio adjustment, to slow population growth and maintain the wild horse population within AML.
> 3. Conduct additional/maintenance gathers after the initial gather(s) to bring wild horse population back to low AML if the population grows to again exceed AML during the 10-year plan life. . . . LF_0019.

The first component of the plan involves gathering and removing horses "as expeditiously as possible" to achieve AML. LF_0020. Because "[s]everal factors could affect the ability to achieve AML with a single first gather, including: lower gather efficiencies, an expected population undercount, and limited contractor

availability," "multiple follow-up gathers" may be necessary. *Id.* The EA explains that "[w]hile the agency's plan is to promptly remove all excess animals above low AML, it is unlikely that a single gather can achieve this because of gather efficiency limitations (animals evading capture during the gather operations), logistical limitations (e.g. weather conditions, terrain and large geographic area to be gathered), population inventory undercounts, space capacity limitations (for holding removed animals), and limited contractor availability and expertise." LF_0020. Because of these limitations, BLM "anticipate[s] that after the initial gather, there will be the need for at least one or more follow-up gathers." *Id.*

The second component of the plan involves population control measures. These measures, which include sex ratio adjustment and fertility control treatments, would begin "as part of the initial gather" and "continue over the 10-year period." LF_0020-21. The third component involves additional "maintenance gathers" which are intended to bring the population back to AML if AML is exceeded again over the ten-year period. LF_0019. The EA notes that "[f]unding limitations and competing national priorities may impact the timing and ability to gather and conduct population control components." LF_0021.

The EA further explains that "[t]he management objective for the Little Fish JMA is to achieve low AML as immediately as possible and to maintain AML over the ten-year plan period through population controls and removal of additional excess animals if the population again exceeds AML." LF_0021.

The Little Fish Decision Record authorizes implementation of the gather plan. LF_0002.

### C. The Stone Cabin Decision and Gather Plan

The Stone Cabin Complex, which consists of over 400,000 acres of land in Nye County, Nevada, is managed by the BLM. SC_6185. The AML range for the Stone Cabin Complex is 242 to 404 wild horses. SC_6188. In 2021, BLM observed over 600 horses and estimated that over 1,000 horses were present in the Stone

Cabin Complex. SC_6188. In October 2022, BLM issued a draft gather plan environmental assessment for public review and comment. SC_1642. In April 2023, BLM issued a final EA and Decision Record. SC_6182, SC_6174.

The Stone Cabin EA outlines BLM's proposed action for gathering and removing excess wild horses from the Stone Cabin Complex. SC_1645. Like the Little Fish gather plan, the Stone Cabin gather plan involves "three distinct types of management activities" over a ten-year period:

> 1. Initially, gather and remove excess wild horses to achieve low AML within the proposed gather area either in a single first gather or with a follow-up gather(s). . . .
> 2. Over the 10-year period, apply population growth suppression methods . . . to gathered and released horses over multiple gathers . . . .
> 3. Over the 10-year period, manage for a population that ensures a thriving natural ecological balance by conducting additional/maintenance gathers after the initial gather(s). . . .SC_6193.

The first component of the plan involves initially gathering and removing excess horses either in a single first gather or multiple gathers. The plan notes that "there are a number of logistical and operational factors that can affect BLM's ability to achieve AML with a single gather, including (but not limited to): that gathers typically achieve less than 100% gather efficiency . . .; the likely population undercount can result in additional excess wild horses being identified in a follow-up inventory . . .; weather conditions . . .; and limited contractor availability . . ." *Id.* These factors mean that "a follow-up gather(s) may be necessary to achieve low AML." *Id.*

The second component involves population control measures which are to take place over the ten-year period. SC_6193. The EA notes that "[f]unding limitations and competing national priorities may impact the timing and ability to gather and conduct the population control elements" of the plan. SC_6194. The third component involves maintenance gathers, which are also to take place over the ten-year period. SC_6193. These gathers are to take place "after the

1  initial gather(s) to bring wild horse population back to low AML if the population
2  grows to again exceed high AML during the 10-year plan." *Id.*

3      The Stone Cabin Decision Record authorizes implementation of the gather
4  plan. SC_6175.

5                    **D. Procedural History**

6      Plaintiff Colvin challenged the Little Fish decision and gather plan in May
7  2023. (ECF No. 1, Case No. 3:23-cv-00204, "*Colvin I.*") Plaintiffs Colvin and Stone
8  Cabin Ranch challenged the Stone Cabin decision and gather plan a few months
9  later. (ECF No. 1, Case No. 2:23-cv-00505-ART-CLB, "*Colvin II.*") The Court
10 consolidated the cases. (ECF No. 18.) In 2024, Plaintiffs moved for summary
11 judgment and Defendants cross-moved for summary judgment. (ECF Nos. 23,
12 24.)

13     **II.    LEGAL STANDARD**

14                    **A. Standard of Review**

15     The APA instructs courts to "hold unlawful and set aside agency action"
16 that is "arbitrary, capricious, an abuse of discretion, or otherwise not in
17 accordance with law," as well as agency action taken "in excess of statutory
18 jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. §
19 706(2). In deciding whether to grant summary judgment on an APA challenge,
20 the district court "is not required to resolve any facts." *Occidental Eng'g Co. v.*
21 *I.N.S.*, 753 F.2d 766, 769 (9th Cir. 1985). Instead, the court determines "whether
22 or not as a matter of law the evidence in the administrative record permitted the
23 agency to make the decision it did." *Id.*

24                    **B. The Wild Horse Act**

25     The WHA vests the BLM with substantial discretion to manage herds of
26 wild horses, requires that the agency base its decision on currently available
27 information and consultation with expert agencies and individuals, and specifies
28 when, in what order and priority, and to what extent the agency should act. 16

U.S.C. § 1333. Among other things, the WHA requires that once BLM determines "that an overpopulation exists on a given area of the public lands and that action is necessary to remove excess animals," it "shall immediately remove excess animals from the range so as to achieve appropriate management levels." 16 U.S.C. § 1333(b)(2); *In Def. of Animals v. U.S. Dep't of Interior*, 751 F.3d 1054, 1062 (9th Cir. 2014). The WHA further provides the order and priority for the BLM to humanely capture, remove, facilitate adoption, or destroy excess horses. 16 U.S.C. § 1333(b)(2)(A)-(C).

### III.    DISCUSSION

Plaintiffs bring a single claim under section 706(2) of the APA, challenging the Little Fish and Stone Cabin decisions and gather plans as unlawful under the WHA. Plaintiffs claim that the decisions and gather plans violate the WHA's mandate to "immediately" remove horses once BLM has determined that excess animals exist. (ECF No. 1, *Colvin I*, at 17; ECF No. 1, *Colvin II*, at 24.) Plaintiffs argue that the plans consider factors which BLM does not have the discretion to consider, namely: funding limitations, competing national priorities, and space capacity (factors Plaintiffs call "off-site conditions"). (ECF No. 1, *Colvin I*, at 17; ECF No. 1, *Colvin II*, at 23-24.) Defendants argue that the gather plans and decisions are reasonable and comply with the WHA and APA. (ECF No. 24.)

### A. Statutory Text

Plaintiffs place substantial weight on the statutory requirement that once the BLM determines "that an overpopulation exists . . . and that action is necessary to remove the animals," it must "*immediately* remove [the] excess animals." 16 U.S.C. § 1333(b)(2) (emphasis added). In Plaintiffs' view, the statutory mandate that the agency act "immediately" precludes any discretion by BLM to adopt long-term gather plans, like those at issue here. Plaintiffs rely on *Friends of Animals v. Culver*, a D.C. district court decision in which the court found that a ten-year "phased" plan exceeds BLM's discretion under the WHA.

(ECF No. 23 at 41); 610 F. Supp. 3d 157, 171 (D.D.C. 2022). Defendants counter that *Culver* must be read in light of other decisions from the D.C. district court and other district courts, all of which have concluded that the term "immediately" affords BLM discretion as to the timing of gathers to remove excess horses. (ECF No. 24 at 23-24.)

Most courts which have examined the meaning of the term "immediately" in the WHA have concluded that the term, read in context, affords BLM some discretion. In *Western Rangeland*, the Utah district court noted that the term "evokes significant urgency and shuns delay," but "an overly literal interpretation of the term belies practical reality." *Western Rangeland Conservation Ass'n v. Zinke*, 265 F. Supp. 3d 1267, 1283 (D. Utah 2017). As such, the mandate to "immediately remove" must include "some discretionary space in which BLM may plan and execute safe, efficient, and effective removals consistent with the broader purposes of the WHA and in compliance with other statutory duties." *Id.* at 1284. The court interpreted the statutory language to require that BLM must "begin and complete removal as soon as logistically possible." *Id.* at 1285.

The D.C. district court has examined the statutory meaning of "immediately" in several recent decisions. First, in *Friends of Animals v. United States Bureau of Land Management* ("*FOA II*"), the court concluded that "[r]ead in context, that direction requires the Secretary to begin the process of removing animals promptly." 548 F. Supp. 3d 39, 59 (D.D.C. 2021). The court reasoned that the statute requires the immediate removal of "excess animals . . . so as to achieve" AML, but "requiring immediate action so as to achieve something is not the same thing as immediately achieving that goal." *Id.* at 60. Accordingly, it was not unreasonable or contrary to law for the BLM to authorize a series of gathers over a period of approximately thirty months. *Id.* In *Culver*, the court took a more restrictive approach, interpreting "immediately" to mean "as expeditiously as humanly possible" and finding that a ten-year phased plan exceeded BLM's

discretion. 610 F. Supp. 3d at 171. Most recently, the court resolved the apparent inconsistency between those decisions and emphasized its continued adherence to the reasoning expressed in *FOA II*. *Friends of Animals v. U.S. Bureau of Land Mgmt.*, 728 F. Supp. 3d 45, 76 (D.D.C. 2024). The court explained that *Culver* did not depart, in practical effect, from the court's holding in *FOA II*, and upheld BLM's ten-year gather plans. *Id.*

While the Ninth Circuit has not directly discussed the meaning of the word "immediately" in the WHA, it has upheld a decision in this district upholding a ten-year gather plan under the WHA. *Friends of Animals v. Silvey*, 353 F. Supp. 3d 991, 1006 (D. Nev. 2018), *aff'd*, 820 F. App'x 513 (9th Cir. 2020).

The Court is persuaded by the reasoning of the Utah and D.C. district courts. The term "immediately" "requires that the agency promptly begin the process of removing excess animals but does not require that it complete that process 'without interval of time.'" *Friends of Animals*, 728 Supp. 3d at 75. The WHA permits the BLM to "adopt gather plans that contemplate conducting a staged gather over a period of time" and at the same time requires that the BLM "conduct the required gathers as promptly as reasonably possible after making a necessary-to-remove-excess-animals determination." *Id.* at 78.

**B. Conditions**

Plaintiffs contend that the gather plans at issue violate the WHA's immediacy requirement because they include consideration of certain factors—factors Plaintiffs call "off-site conditions." (*See* ECF No. 1, *Colvin I*, at 13; ECF No. 1, *Colvin II*, at 23.) Specifically, Plaintiffs argue that Defendants have discretion to consider factors related to ensuring that the removals are executed in a safe, efficient, and effective manner ("on-site conditions"), but do not have discretion to consider other factors, including funding limitations, competing national priorities, and space capacity limitations ("off-site conditions"). (ECF No. 23 at 42-25.) Plaintiffs rely exclusively on *Western Rangeland* in putting forward this

argument. (ECF No. 23 at 43.)

Plaintiffs' reliance on *Western Rangeland* is misplaced because it concerned a different kind of APA challenge. Plaintiffs bring this case under section 706(2), challenging BLM's decisions as final agency action. (ECF No. 23 at 10.) *Western Rangeland* involved a challenge under section 706(1) of the APA, which requires a court to determine whether the agency action was "unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1); 265 F. Supp. 3d 1267, 1276. The court held that BLM did not fulfil its statutory obligation to immediately remove excess animals, but that the delay was not unreasonable. *Id.* at 1287, 1297. In considering the 706(1) challenge at issue in this case, the court's review is limited to "the administrative record in existence at the time of the agency's decision." *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 560 (9th Cir. 2000) (citation omitted). Any delay in implementation of the plans is beyond the scope of this Court's review.  Plaintiffs do not point to other caselaw, nor is the Court aware of any, holding that the BLM may not consider factors such as funding limitations, competing national priorities, and space capacity limitations, in its gather plans.

### C. Application to Gather Plans

The plans at issue here do not violate the WHA's mandate to "immediately" remove excess horses. Both gather plans indicate that BLM will conduct its initial gather or gathers as promptly as reasonably possible. The Little Fish plan is to take place "as expeditiously as possible" and "as immediately as possible." LF_0020-21. Likewise, the Stone Cabin EA states that "BLM's plan is to immediately remove all excess animals above AML," while noting that logistical factors may make it unlikely that they could remove all excess animals in a single gather, thus necessitating follow-up gathers. SC_6365.

While both plans span ten years in total, Defendants maintain that that timeframe relates only to the population control and maintenance gather components. (ECF No. 24 at 20.) The record supports their position. The text of

the Stone Cabin EA indicates that the first component—the initial gather(s)—is to take place "[i]nitially" while the second and third components—the population control and maintenance gathers—are to take place "[o]ver the 10-year period." SC_6193. The Little Fish record, while not quite as explicit on this point, also supports Defendants' position. The plan explains that BLM anticipates that "after the initial gather, there will be the need for at least one or more follow-up gathers above the low end of AML and gathers will also be necessary over the course of the ten-year period to apply population control measures." LF_0020. The most natural reading of that sentence is that the initial gather and follow-up gathers will occur reasonably soon, while the additional population control gathers (the second component) will take place throughout the ten years of the plan. The next sentence confirms that reading, explaining that additional maintenance gathers (the third component) will also take place "during the 10-year period." *Id.*

The language that Plaintiffs take issue with—stating that the gather plan may be impacted by funding, competing national priorities, and space capacity—also does not make the plans unlawful. First, as Defendants explain, the funding and priorities language relates only to the second and third components of the plan—which, as discussed above, are distinct from the initial gather or gathers. And consideration of space capacity is necessary for BLM to comply with its statutory duty to "humanely capture[s] and remove[]" excess animals and ensure that they receive "humane treatment and care (including proper transportation, feeding, and handling)." 16 U.S.C. § 1333(b)(2)(B). BLM's duty to "immediately remove" includes "some discretionary space" to "plan and execute safe, efficient, and effective removals consistent with the broader purposes of the WHA and in compliance with other statutory duties." 265 F. Supp. 3d at 1284.

Because the ten-year phased gather plans in this case indicate that the initial gathers and removals to achieve AML will take place as promptly as reasonably possible, the plans comply with the WHA.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## IV.    CONCLUSION

The Court therefore DENIES Plaintiffs' motion for summary judgment (ECF No. 23) and GRANTS Defendants' cross-motion for summary judgment (ECF No. 24).

The Court further GRANTS Defendants' motion for leave to file a document (ECF No. 28).

The Clerk of the Court is directed to enter judgment in favor of Defendants and close this case.

DATED: January 22, 2025

_____
ANNE R. TRAUM
UNITED STATES DISTRICT JUDGE